WAYNE BRAYFIELD and DON )
CHADWELL, INDIVIDUALLY AND )
d/b/a PLEASANTVILLE STUDIO TWO, )
)           Appeal No.
    Plaintiffs/Appellants,       )           01-A-01-9701-CV-00007
)
v.                               )
)
KENTUCKY NATIONAL INSURANCE )           Circuit Court No.
COMPANY,                         )           14366-C
)
    Defendant/Appellee.          )

FILED

September 30, 1998

Cecil W. Crowson
Appellate Court Clerk

COURT OF APPEALS OF TENNESSEE

APPEAL FROM THE CIRCUIT COURT FOR SUMNER COUNTY

AT GALLATIN, TENNESSEE


THE HONORABLE THOMAS GOODALL, JUDGE

LOUISE R. FONTECCHIO
Bruce, Weathers, Corley, Dughman & Lyle
2075 First American Center
315 Deaderick Street
Nashville, Tennessee 37238-0275
ATTORNEY FOR PLAINTIFFS/APPELLANTS

GARY A. BREWER
PARKS T. CHASTAIN
Brewer, Krause, Brooks & Mills
Suite 2600, The Tower
611 Commerce Street
P.O. Box 23890
Nashville, Tennessee 37202-3890
ATTORNEY FOR THE DEFENDANT/APPELLEE

AFFIRMED AND REMANDED


WALTER W. BUSSART, JUDGE

This is an appeal by plaintiffs/appellants, Wayne Brayfield and Don Chadwell,[1] from a jury verdict and order of the trial court awarding defendant/ appellee, Kentucky National Insurance Company, $64,754.54. Appellants contend any misrepresentations were immaterial as a matter of law, the trial court incorrectly instructed the jury, Appellee's counsel made improper statements during his closing argument, errors committed during voir dire tainted the jury, and the trial court allowed inadmissable evidence. The pertinent facts are as follows.

## I.   Facts and Procedural History

Wayne Brayfield and Don Chadwell ("Appellants") purchased the Pleasantville Studio Two ("The Studio") from John Shelton in October 1993. Appellants assumed the existing mortgage of approximately $70,000 and took out a $63,000 loan from a bank in Paris, Tennessee. They offered equipment as security for the Paris bank loan. They also paid Mr. Shelton $25,000 cash and agreed to pay him the balance of approximately $78,000 in installments of $2,000 per month beginning in March of 1994. Appellants signed a promissory note, but Mr. Shelton never recorded a deed of trust. Kentucky National Insurance Company ("Appellee") issued an insurance policy to Appellants covering the Studio. The policy provided $250,000 coverage on the building and $125,000 coverage on the contents.

A fire destroyed the Studio on 11 September 1994. There was contradictory proof as to whether the building was a total loss or could be salvaged. Appellants' experts estimated the cost of repairs to be approximately $275,000, and Appellee's experts estimated the cost repairs to be $134,676.95. The parties stipulated the damage to the contents was at least equal to the coverage amount. The Hendersonville Fire Marshall and Appellee's investigator, Don Hoarist, concluded the fire was intentionally started by using large quantities of a flammable liquid.

---

[1] Individually and d/b/a Pleasantville Studio Two

Appellants filed a proof of loss with Appellee. Appellee interviewed Appellants, and Appellants provided Appellee with financial documents. Appellee later questioned Appellants under oath regarding the Studio, their financial situations, and the fire. Ultimately, Appellee denied the claim based on its conclusions that Appellants intentionally caused the fire and committed material misrepresentations in the claim process. Appellee believed Appellants had misrepresented their role in the fire and the amount of the loss. It also believed they had misrepresented their dealings with the Paris bank and Mr. Shelton's interest in the Studio. Despite its findings, Appellee paid off the third party mortgage holder in the amount of $68,378.54.

After purchasing the Studio, Appellants left the Paris bank loan in Mr. Shelton's name. They made payments on the Paris bank loan from October 1993 until February 1994. In March 1994, Chadwell obtained a secured loan from a West Virginia bank to purchase the equipment which secured the Paris bank loan. The purchase price equaled approximately one-half the outstanding Paris bank loan amount. Appellants claim they simply offered to purchase the equipment from the bank and the bank accepted the offer. Appellee claims Appellants failed to make the payments and then offered to purchase the collateral at a reduced price when the bank repossessed the equipment. Regardless, the parties do not dispute the fact that Appellants did not make any payments to the Paris bank after purchasing the equipment. Instead, they made payments on the note at the West Virginia bank.

Appellants did not pay the $2,000 installments to Mr. Shelton. They claimed they had an agreement with Mr. Shelton under which Appellants would not have to pay the installments if business was slow. Mr. Shelton did, however, have his attorney send a letter dated 12 July 1994 demanding payment. Appellants claimed Mr. Shelton changed his mind and told Brayfield in front of a witness, Michelle Hughes, to ignore the letter. Appellee claims Mr. Shelton did not change his mind and was attempting to take back the business when the fire occurred.

Appellants filed suit on 28 June 1995 for their actual damages under the policy. Appellee filed an answer and counter-claim. Appellee claimed

3

Appellants were not entitled to the policy proceeds because they committed arson and made material misrepresentations. Specifically, Appellee alleged Appellants mis-represented the extent of the damage, their purchase of the equipment securing the Paris bank loan, Brayfield's use of paint thinner, whether the Studio had ever been for sale, Shelton's interest in the property, and Appellants' dealings with Shelton. Appellee also sought reimbursement for the money paid to the third party mortgage holder and damages for bad faith. The parties entered an agreed order which provided that Appellee's counterclaim was based on misrepresentations concerning the cause of the fire, not Appellants' insurance application.

A jury heard the case from 29 July 1996 until 5 August 1996. The court denied the parties' motions for directed verdict. The jury determined that neither Brayfield nor Chadwell set the fire and that Appellants made a material misrepresentation with respect to the claim process. The jury also determined Appellee was not entitled to recover on its bad faith counterclaim. The court entered a judgment on 14 August 1996 awarding Appellee a judgment in the amount of $68,754.54. Appellants filed a Rule 50.02 motion or, in the alternative, a motion for a new trial. Appellee filed a motion for discretionary costs. The court entered two orders on 8 November 1996 overruling Appellants' motion and granting Appellee's motion. The court stayed the judgment pending appeal. Appellants filed their notice of appeal on 2 December 1996 and presented the following issues: 1) whether the trial judge failed to properly instruct the jury regarding the law; 2) whether any misrepresentations which the jury found Appellants committed were immaterial as a matter of law; 3) whether counsel for Appellee made improper jury argument which unfairly prejudiced the jury; 4) whether the jury was tainted by errors committed during voir dire and not corrected by the trial judge; and 5) whether the trial judge admitted inadmissable evidence.

Before addressing these issues we note an important point. There is no indication in the jury's verdict of the actual misrepresentation relied upon by the jury in rendering its decision. The verdict form asked several questions of the jurors. The only question regarding misrepresentations was: "Did either of the plaintiffs, Wayne Brayfield or Don Chadwell, make a willful, false statement as

4

to a material matter in connection with the claim process with the intent to deceive the defendant, Kentucky National Insurance Company." The jury answered yes. This broad finding makes it difficult to review the decision below. Nevertheless, it is the opinion of this court that there was sufficient evidence from which the jury could conclude Appellants intentionally misrepresented a material fact in the claim process.

## II. Potential Misrepresentations

Appellants have listed four alleged misrepresentations urged by Appellee in closing argument. Those misrepresentations involve: 1) value of the content loss; 2) value of the property loss; 3) Appellants' financial condition; and 4) whether certain saddles were in the building at the time of the fire. Appellants argue these misrepresentations were immaterial to the claim process.

An insurance company may defend a suit for the proceeds of a fire insurance policy by proving the insured committed arson or made an intentional misrepresentation of a material fact in the claim process. *See Insurance Co. v. Scales*, 101 Tenn. 628, 638, 49 S.W. 743, 746 (1899); *Wilder v. Tennessee Farmers Mut. Ins. Co.*, 912 S.W.2d 722, 725-26 (Tenn. Ct. App. 1995); *Nix v. Sentry Ins.*, 666 S.W.2d 462, 463-65 (Tenn. Ct. App. 1983). The insurance company must establish either defense by a preponderance of the evidence. *See Hendrix v. Insurance Co. of N. Am.*, 675 S.W.2d 476, 481 (Tenn. Ct. App. 1984) (cited in *Wilder*, 912 S.W.2d at 726).

### A. Value of the Property Loss

Appellants argue any misrepresentations regarding the value of the property were not material because the application of the valued policy law resulted in a conclusive presumption that the value of the property was $250,000. While it is true that the law creates a rebuttable presumption, it does not necessarily follow that the value of the property lost is immaterial. The valued policy law provides:

> Every agent, within ninety (90) days after making or writing any contract of fire insurance on any building or structure in this state,

shall cause the building or structure to be personally inspected; and no company, and no officer or agent thereof, and no insurance broker, shall knowingly issue, negotiate, continue or renew or cause to permit to be issued, negotiated, continued or renewed any fire insurance policy upon property or interests therein within the state of an amount which, with any existing insurance thereon, exceeds the fair value of the property.

Tenn. Code Ann. § 56-7-801 (1994).

If buildings within the state insured against loss by fire are totally destroyed by fire, the company shall not be liable beyond the actual value of the insured property at the time of the loss or damage; and if it appears that the insured has paid premiums on an amount in excess of the actual value, the insured shall be reimbursed the proportionate excess or premiums paid on the difference between the amount named in the policy and the actual value, with interest at six percent (6%) per annum from the date of issue; and the excess of premiums, and interest thereon, shall be allowed the insured from the time any companies carrying the insurance at the time of the loss have continuously carried the insurance on the destroyed buildings, whether under policies existing at the time of the loss or under previous policies in the same companies.

*Id.* § 56-7-802.

If the agent fails to place a reasonable value on any such insured property within the ninety (90) days, as provided in § 56-7-801, and which is agreed to by the insured, and a loss occurs, in that event the value as shown by the policy or application shall be conclusively presumed to be reasonable, and settlement shall be made on that basis.

*Id.* § 56-7-803. These sections are remedial, and this court shall construe them liberally in furtherance of their purpose. *Price v. Allstate Ins. Co.*, 614 S.W.2d 377, 381 (Tenn. Ct. App. 1981). The primary purpose of these sections is "to protect insureds from being subjected to the insurer's argument that the building had been over insured and gives the insurer an incentive to inspect risks and assist insureds in establishing proper insurance evaluations." *Id.* The valued policy law applies only in situations involving a total loss. *See Third Nat'l Bank v. American Equitable Ins. Co.*, 27 Tenn. App. 249, 271 & 275, 178 S.W.2d 915, 924 & 926 (1943).

Appellee does not insist that it overinsured the Studio. Instead, it argues that the valued policy law does not apply because the loss was a partial loss as opposed to a total loss as claimed by Appellants. In other words, Appellee contends Appellants intentionally misrepresented that the loss was total in order

6

to recover the full amount of the policy. Appellants counter that any disagreement over the extent of the loss was simply a difference of opinion, not an intentional misrepresentation of a material fact.

It is the opinion of this court that the valued policy law does not enter into the case until there is a determination of the extent of the loss, total or partial. The valued policy law provides an answer to the question of the value of a total loss. It does not address the issue of whether the insured misrepresented the extent of the loss, and it can not be used by the insured to perpetuate fraud. Moreover, an insurer may defend an action by claiming the insured misrepresented the extent of the loss. The extent of the loss is a material fact in the claim process because of the valued policy law. That is, the extent of the loss, total or partial, will determine the application of the valued policy law and, therefore, the amount of the recovery. Thus, the jury in this case could have found in favor of Appellee if it determined Appellants intentionally misrepresented that the loss was total.

## B. Interest in the Property and Contents

Appellee alleges Appellants misrepresented John Shelton's interest in the Studio and the Paris bank's interest in the equipment in the proof of loss. Such misrepresentations are material because the fact misrepresented could affect the extent of Appellants' recovery under the policy.

## C. Evidence of Appellants' Financial Condition

Appellants argue that any misrepresentations regarding Appellants' financial condition, their relationship with John Shelton and the Bank in Paris, and their intentions to buy the property or rebuild are immaterial. Appellants contend these facts are relevant only to prove motive to commit arson. We cannot agree with Appellants' position.

Appellants rely on *Nix v. Sentry Ins.*, 666 S.W.2d 462 (Tenn. Ct. App. 1983), to support their argument. In *Nix*, the insured's house burned and the insurer refused to pay the claim. The insurer defended against the insured's

7

action by alleging arson and intentional misrepresentation. The appellate court affirmed the trial court's conclusion that there was insufficient evidence to sustain a finding of arson. The appellate court then concluded that the evidence of the insured's financial condition was material to the issue of arson, not to the loss claimed. *Nix*, 666 S.W.2d at 464. Thereafter, the court addressed any possible mis-representations and concluded they were either immaterial, unintentional, or unproven. *Id.* at 465. The court then reversed the trial court's decision in favor of the insured.

Appellants' reading and application of the holding in *Nix* is erroneous. To explain, the decision in *Nix* did not involve whether a particular fact was material to the claim process. Instead, the holding addressed the relevancy of evidence. The *Nix* court determined the insured's financial condition was not relevant to the issue of whether the insured misrepresented a fact material to the claim process.

The *Nix* court defined the term "financial condition" as "[w]hether or not Nix was liquid or solvent." *Id.* at 464. A careful reading of the case does not reveal much about the specific evidence. It is the opinion of this court that evidence of the solvency of an insured may be relevant to the issue of whether an insured misrepresented a fact material to the claim process. In addition, other financial evidence may be relevant as well. In this case, for example, the financial evidence is relevant to prove Appellants' intentions when representing the loss was a total loss and the validity of Appellants' representation that no one else had an interest in the property or contents.

### III.    The Jury's Verdict

"Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d). It is the opinion of this court that there is material evidence to support this jury verdict. The jury could have determined based on the evidence that Appellants misrepresented the extent of the loss and their interest in the property or its contents. Whether the misrepresentations relied upon by this court are the same as those relied upon by the jury is something we will never know. Nevertheless,

8

we are compelled to uphold the verdict as it is supported by the law and evidence.

## IV.    Jury Instructions, Closing Argument, and Voir Dire

It is the opinion this court that, given the above decision, the errors asserted by Appellants involving the jury instructions, closing argument, and voir dire, if any, were harmless.

## V.    Admissibility of Evidence

Appellants argue the trial court erred when it allowed Detective Witherow, a criminal investigator for the Hendersonville Police Department, to testify that Appellants were uncooperative.  They contend the only instance of non-cooperation was Appellants' refusal to take a lie detector test, evidence of which is inadmissible.[2]  Appellants assert the trial court should not have allowed Detective Witherow to testify Appellants were uncooperative when the only basis for that testimony was inadmissable evidence.  Appellee responds by citing other instances in the record in which Appellants were uncooperative.

A review of Detective Witherow's testimony reveals that he related two "instances" of noncooperation.  First, he described his attempts to obtain information from Mr. Brayfield as "pulling teeth".  Second, he testified to his belief that Appellants had deliberately hidden facts.  Hence, Detective Witherow did not really relate any instances of the Appellants being "uncooperative," instead, he gave his opinion or characterized their conduct.

Rule 701, Tenn. R. Civ. P., is entitled "Opinion Testimony by Lay Witnesses" and provides as follows:

(a)  Generally.  If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are

(1)  rationally based on the perception of the witness and

---

[2] The trial court excluded testimony that Appellants had refused to take a lie detector test.

9

(2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

(b) Value. A witness may testify to the value of the witness's own property or services.

Detective Witherow's testimony in regard to cooperation is lay testimony. Hence, he must enumerate facts, leaving it to the jurors to draw inferences, unless he cannot readily, accurately and adequately testify without giving an opinion. Here, he could have simply told what Appellants did or did not do without the characterizations of their conduct. We believe the trial court should have excluded this testimony under Rule 701. There is, however, no showing that this error affected the jury verdict and it is, therefore, harmless. Tenn. R. App. P. 36(b); *Pettus v. Hurst*, 882 S.W.2d 783, 787 (Tenn. Ct. App. 1993).

## V. Conclusion

It is the opinion of this court that there is material evidence in the record from which the jury could determine Appellants misrepresented either the extent of the damage or their interest in the property or its contents. Moreover, these facts were material to the claim process. It is also our opinion that any errors in the jury instruction, closing argument, and voir dire were harmless given our conclusion that the evidence supports the jury's verdict. Finally, the trial court did err in allowing Detective Witherow to testify as he did, but such error was harmless here.

Therefore, it follows that the decision of the trial court is affirmed and remanded for any further necessary proceedings. Costs on appeal are taxed against plaintiffs/appellants, Wayne Brayfield and Don Chadwell individually and d/b/a Pleasantville Studio Two.

_____
WALTER W. BUSSART, JUDGE

CONCUR:


_____
BEN H. CANTRELL, JUDGE


_____
WILLIAM C. KOCH, JR., JUDGE