**Billy WILDER and wife, Lillian Wilder, Plaintiffs/Appellees,**

v.

**TENNESSEE FARMERS MUTUAL INSURANCE COMPANY, Defendant/Appellant.**

Court of Appeals of Tennessee, Middle Section.

July 14, 1995.

Permission to Appeal Denied by Supreme Court Nov. 20, 1995.

---

Arthur E. McClellan, Gallatin, for defendant/appellant.

Russell D. Hedges, Tullahoma, for plaintiffs/appellees.

## *OPINION*

CANTRELL, Judge.

This action on an insurance policy involves issues of arson, fraud in the claims process, the admissibility of the plaintiffs' statement under oath, and prejudgment interest. The Chancery Court of Franklin County granted judgment to the plaintiffs. We modify the chancellor's award of prejudgment interest. Otherwise, we affirm.

### I.

In 1983 the plaintiff, Billy Wilder, moved into a house owned by his parents. In 1986 he married Lillian Wilder. Early in 1989 Mr. Wilder's father died and Mr. Wilder's mother conveyed the house to him and Lillian. Billy Wilder obtained a homeowners policy from Tennessee Farmers Mutual Insurance Company, insuring the house for $40,000 and its contents for $24,000. In the summer of 1989, Mr. Wilder and Lillian separated, partly because of Mr. Wilder's heavy drinking. Lillian Wilder had her own apartment, but Billy Wilder frequently stayed there with her, rather than at the house.

On October 17, 1989, seventy-one days after the effective date of the insurance policy, the house and its contents were damaged by fire. The insurance company suspected that the fire had been deliberately set, because its investigators found traces of an accelerant in the house. They also found a witness who testified that Mr. Wilder had hired him to burn the house. For this reason, and also because they thought Mr. Wilder had fraudulently misrepresented the value of the real and personal property destroyed, the insurance company denied the claim. The Wilders sued for payment.

After a bench trial the chancellor held the case under advisement for two years and four months, and then issued a memorandum opinion finding for the plaintiffs. The final judgment included damages of $26,500 to the house, $6,500 for loss of personal property, and $15,957.20 in prejudgment interest calculated from the date of the fire.

### II.

### The Arson Defense

■ The defendant's policy excludes recovery if the loss occurred from "an action by or at the direction of an insured person committed with the intent to cause a loss." If Mr. Wilder either started the fire or hired someone else to do it, the insurance company has a complete defense to this claim.

There is no evidence that Mr. Wilder set the fire himself: The appellant does not argue that he did. It relies on the suspicious circumstances shown by the post-fire investigation and the evidence of the witness who said Mr. Wilder hired him to burn the house.

There is evidence that the fire was deliberately set. A fireman who answered the call to extinguish the blaze testified that there seemed to be multiple, unconnected fires in several rooms and that the fire patterns indicated an accelerant had been used. Arson investigators for the state and for the defendant were of the same opinion.

The evidence on which the defendant relies most heavily is the testimony of Jerry Pruett, who drifted into the community in 1987 and lived in his van at various locations while he did odd jobs around the community. He met Mr. Wilder in July of 1989 at Mr. Wilder's mother's home, where he parked his van a few times. He and Mr. Wilder drank together. He testified that once at Mrs. Wilder's home Mr. Wilder offered him $5,000 to burn his house. According to Mr. Pruett, Mr. Wilder thought that if he could get the insurance money from the house he could keep it from his estranged wife. Mr. Pruett said that a few days later he told Mr. Wilder, "I guess I'll go ahead and do it." He testified that he went over to the house at night, between the ninth and the eleventh of October in 1989, and started a fire in a utility closet with some paper and rags. He did not start multiple fires nor did he use any type of liquid accelerant. It should also be noted

that the dates do not correspond to the actual date of the loss.

Mr. Pruett testified that he was staying with Jay Corker, Mr. Wilder's uncle, on the twenty-first of October when Mr. Wilder arrived drunk and picked a fight. When Mr. Pruett got the best of him, Mr. Wilder gave up and they started to walk back to Mr. Corker's trailer, when Mr. Wilder pulled a knife and slashed Mr. Pruett's stomach, saying, "That's for burning my house."

Mr. Wilder denied all of the facts about hiring Mr. Pruett to burn the house. He acknowledged that the fight occurred at his uncle's trailer but said Mr. Pruett started it and threatened him with a hunting knife. He was not sure when the fight occurred with reference to the date the house burned.

On this question the chancellor found:

> The Court, after due consideration of all the facts and testimony in this case, is of the opinion that the Plaintiff did not retain the services or have Jerry Pruitt burn his dwelling. There does not appear to be any evidence in the record that the Plaintiff was suffering any great or tremendous financial hardship at the time of the fire. The record indicates the Plaintiff was attempting to sell his home which was free of all debt. While it is true the Plaintiff had never engaged in what I would call steady and gainful employment, he had always had a source of money through the financial support of his parents. Although there were times when that financial support would be less than others, it would appear he was never in dire financial straits. It is true the Plaintiff was a heavy drinker and was at times known to drink to excess with Jerry Pruitt. However, it appears that he and Mr. Pruitt were not always on friendly terms and in fact on two occasions had harsh words for one another, one of which resulted in Jerry Pruitt being stabbed by the Plaintiff. The Court, having had an opportunity to view the video testimony of Jerry Pruitt, does not find Mr. Pruitt to be a credible witness. The Court is of the opinion that the word of Jerry Pruitt that he was retained or asked by the Plaintiff to set fire to the dwelling is not in this case sufficient to make a finding

that Plaintiff, who has denied doing this, was in fact guilty of complicity in committing arson. Therefore, since the burden of proving civil arson is on the defendant, the Court is of the opinion this burden has not been carried by the weight of all the evidence.

It seems to us that the arson defense rests on the testimony of Mr. Pruett. He alone supplies the motive for Mr. Wilder to burn the house: to prevent his estranged wife from getting her share of it in a divorce. Although the defendant argues that Mr. Wilder was in need of money because of other circumstances, the record does not show that he was having difficulty, existing as he always did on his mother's largess, doing odd jobs, living with his estranged wife.

As the chancellor's findings indicate, he simply did not believe Mr. Pruett. The credibility determination is entitled to great weight on appeal, *Town of Alamo v. Forcum–James Co.,* 205 Tenn. 478, 327 S.W.2d 47 (1959). Having reviewed the evidence in the record, we are convinced that the chancellor was justified in finding that Mr. Pruett lacked credibility. Although we could conclude that the fire was deliberately set by somebody, the only evidence linking the fire to Billy Wilder was that of Mr. Pruett. Therefore, we affirm the chancellor's decision on the arson defense.

### III.

### The Misrepresentation Defense

The defendant insists that the plaintiffs intentionally misrepresented the value of their property lost in the fire, thereby violating the following policy provision:

> This entire policy is void as to the insured, if an insured person has intentionally concealed or misrepresented any material fact or circumstances relating to this insurance or acted fraudulently or made false statements relating to this insurance.

The law in Tennessee is well settled that fraud in the claims process can prevent a recovery on a policy. *Boston Marine Insurance Company v. Scales,* 101 Tenn. 628, 49 S.W. 743 (1899). But, since the loss of

coverage would amount to a forfeiture "a strict construction should be adopted, and the forfeiture not enforced except on the plainest grounds, if at all." 101 Tenn. at 639, 49 S.W. at 746. See also *Hendrix v. Insurance Co. of North America,* 675 S.W.2d 476 (Tenn.App.1984); *Nix v. Sentry Insurance,* 666 S.W.2d 462 (Tenn.App.1983); *Baker v. Nationwide Mutual Fire Ins. Co.,* 646 S.W.2d 440 (Tenn.App.1982).

■ Fraud involves a question of fact, and the facts must show an intent to deceive on a material matter. *Womack v. Blue Cross and Blue Shield,* 593 S.W.2d 294 (Tenn.1980). On the question of fraud in the claims process, the chancellor found:

> On the issue as to whether or not the Plaintiff committed a misrepresentation of material fact in the claims process, the Court concludes that the Plaintiff has not. While it is true the Plaintiff has admitted being less than candid with the Defendant throughout the claims process, the question is whether or not he has been guilty of misrepresenting a material fact. The plaintiff's abuse of alcohol for many years has clearly impaired his memory and judgment on many things. Many of the questions of misrepresentation involve where the Plaintiff obtained items or at what cost they were obtained. The Court is of the opinion that none of these misrepresentations are of a material nature and fall within the ruling of the court in *Baker v. Nationwide Mutual Fire Insurance Company,* 646 S.W.2d 440 (Tenn.App.1982). Perhaps, the most serious allegation has to do with the existence of a Grandfather Clock which the Plaintiff claimed was in the living room of the house at the time of the fire. Expert testimony introduced by the Defendant would lead the Court to believe that the clock was not in the room at the time of the fire. There was a question of whether the clock was in fact stolen the night of the fire or some other time since the Plaintiff was not occupying the dwelling on a regular basis at the time of the fire. It is true the Plaintiff never formally filed a loss claim based upon this item having been stolen, but it is clear the issue was discussed near the time of the fire. It is not clear why the plaintiff never filed a proof of loss based upon this item having been stolen. It appears the plaintiff submitted it as part of his loss in the fire instead. The Court concludes that this item was lost, whether by fire or whether by having been stolen, and it would appear the Plaintiff's testimony that in his mind it did not matter in what way it was lost, it was still a loss to him. Therefore, the Court finds that the Plaintiff has not materially misrepresented a fact in the claims process and finds that the testimony of Tom Lynch as to the value of the items lost is persuasive, therefore, the Plaintiff should recover Six Thousand Five Hundred ($6,500.00) Dollars for the lost items claimed lost in the fire.

These findings are presumed to be correct and may be set aside only if the evidence preponderates against them. Rule 13(d), Tenn.R.App.P. While many of the statements in the various exhibits appear to be false, and many are inconsistent, we cannot say that the evidence preponderates in favor of a finding that the statements were made with the intent to deceive. Therefore, the defendant has failed to carry its burden of proving its fraud defense "on the plainest ground."

## IV.

### The Admissibility of the Sworn Statements

The insurance company asserts on appeal that the chancellor erred in disallowing the introduction of Mr. Wilder's sworn statement taken prior to trial.

■ We think the chancellor was correct in excluding the statement. The statement was made out of court and we assume it was offered to prove the truth of the matters asserted in it. As such it is clearly hearsay, Rule 801(c), Tenn.R.Evid., and not admissible as a general rule. Rule 802, Tenn.R.Evid. Since it contained admissions by Mr. Wilder, the admissions might have been read into evidence, Rule 803(1.2), Tenn. R.Evid., or to the extent that the statement included assertions that were inconsistent with Mr. Wilder's statements made in court,

they could have been used to impeach him. Rule 613, Tenn.R.Evid. But the defendant shows a common misunderstanding of the rules of evidence in assuming that an out-of-court statement of a party is per se admissible.

While we find no error in refusing to allow the defendant to exhibit the statement, we have considered the entire record and find that the defendant was not prejudiced in any way by its exclusion.

## V.

### The Damage to the House

■ The chancellor awarded the plaintiffs $26,500 for the damage to the house. The measure of damages for injury to real estate is stated in *Fuller v. Orkin Exterminating Co., Inc.*, 545 S.W.2d 103 (Tenn.App.1975) as:

... the difference between the reasonable market value of the premises immediately prior to and immediately after injury but if the reasonable cost of repairing the injury is less than the depreciation in value, the cost of repair is the lawful measure of damages.

545 S.W.2d at 108.

There is evidence in the record from which the following alternative inferences could be drawn: that the house was worth $62,500 before the fire and that it was a total loss; or that the cost to restore it to its original condition would be $49,000 or $31,899.16 or $26,582.63 depending on which expert you believed. The house had in the meantime been sold for $12,000 and the purchasers had spent $10,655 to repair it, but the repairs did not include replacing the central heat and air, the carpets, or one of the interior walls. The purchasers also furnished much of the labor themselves.

Although the exact figure awarded by the chancellor was not offered by a specific witness, the range of the proof would have justified a higher award—or a lower one. The evidence does not preponderate against the chancellor's finding.

## VI.

### Pre–Judgment Interest

The chancellor awarded the plaintiffs prejudgment interest from the date of the loss, a total of $15,957.20. The authorization for awarding prejudgment interest is found in Tenn.Code Ann. § 47–14–123:

Pre-judgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum;

. . . .

■ We have held that the award is within the sound discretion of the trial court, *Otis v. Cambridge Mutual Fire Ins. Co.*, 850 S.W.2d 439 (Tenn.1992). But the discretion is not absolute. *Howard G. Lewis Construction Co. v. Lee*, 830 S.W.2d 60 (Tenn.App.1991).

[10] We do not think it is equitable to allow prejudgment interest from the date of the loss. There are several reasons for our conclusion. First, the policy did not require the defendant to pay the claim until sixty days after receiving the proof of loss and it is not clear from the record when the plaintiffs finally furnished the defendant a properly executed proof of loss. Second, this was an unliquidated claim for breach of contract, and the defendant had a plausible defense. *Howard G. Lewis Construction Co. v. Lee*, 830 S.W.2d 60 (Tenn.App.1991). Finally, over two years of the delay was attributable to the court. So, we think it was an abuse of discretion to allow prejudgment interest from the date of the loss.

We do think, however, that the defendant was responsible for part of the delay and has had the use of the money for the entire period. Therefore, we think an award of prejudgment interest for two years is justified.

The judgment of the court below is modified to award prejudgment interest for a period of two years. In all other respects the judgment is affirmed and the cause is

remanded to the Chancery Court of Franklin County for the calculation of the amount of prejudgment interest and the entry of a judgment in accordance with this opinion. Interest on the judgment shall accrue from September 13, 1994, the date of the original judgment. Tax the costs on appeal to the appellee.

TODD, P.J. (M.S.), and KOCH, J., concur.