# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
June 09, 2015 Session

## STACY FOSTER-HENDERSON v. MEMPHIS HEALTH CENTER, INC.

### Appeal from the Chancery Court for Shelby County
### No. CH071016     Kenny W. Armstrong, Chancellor

_____

### No. W2013-02834-COA-R3-CV – Filed July 22, 2015
_____

This appeal involves a contract for employment entitling the employee to sixty days advance notice of the employer's decision to terminate the contract and six months additional salary from the date of the termination. The employer argued that the termination was effective in May 2005 and, therefore, that the employee had been fully compensated pursuant to the contract. The trial court ruled that the termination occurred in June 2005 and awarded employee damages equivalent to two months' salary. We conclude that the evidence preponderates in favor of finding that the employee did not receive the requisite notice of the termination of her employment until September or October 2005 at the earliest. Accordingly, we reverse the judgment of the trial court and award employee damages equivalent to six months' salary, as well as partial prejudgment interest. Reversed and remanded.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the Court, in which ARNOLD B. GOLDIN, J., and BRANDON O. GIBSON, J., joined.

Christopher F. Donovan, Memphis, Tennessee, for the appellant, Stacy Foster-Henderson.

Robin H. Rasmussen and Peter D. Baskind, Memphis, Tennessee, for the appellee, Memphis Health Center, Inc.

## OPINION

## Background

Marion Foster served as the Chief Executive Officer of Defendant/Appellee Memphis Health Center, Inc. ("MHC") from July 2004 until sometime in 2005. The exact date of her termination is the central issue in this appeal. Under Ms. Foster's contract of employment, she was to receive six months' salary upon her termination. Specifically, her contract provides:

> This Agreement may be terminated by the mutual assent of the parties hereto; or by election by MHC or the Employee with sixty days advanced notice.
>
> MHC may terminate this Agreement with or without cause at any time and shall be obligated to pay Employee the compensation the equivalent of six (6) months salary, plus accrued vacation and other employee benefits up to the date of termination.

The contract further provided that Ms. Foster would be paid a salary of $80,000.00 for the first year, which would increase to at least $82,400.00 in July 2005.

MHC subsequently went into judicial receivership, and an entirely new Board of Governors ("Board") was appointed. Soon after the new Board was in place, the Board suspended several employees, including Ms. Foster. Ms. Foster was notified of her suspension by letter of April 29, 2005. It is undisputed that MHC paid Ms. Foster her salary until October 2005.

On May 22, 2007, Ms. Foster filed a complaint against MHC for breach of her employment contract, seeking compensation for six months of salary and benefits. Specifically, Ms. Foster alleged that she had never been given notice that her employment with MHC was terminated. Additionally, Ms. Foster alleged that because her termination was not effective until after September 15, 2005, at the earliest, she was owed six months' additional salary from the date of the termination.

MHC filed an answer denying Ms. Foster's claim on June 14, 2007. Thereafter, the case went dormant until approximately November 1, 2011, when MHC filed a motion to dismiss for lack of prosecution. According to MHC's motion, Ms. Foster had taken no action on the case since her final discovery response occurred on June 10, 2010. On November 7, 2011, MHC also filed a motion for summary judgment. On June 28, 2012, Ms. Foster's counsel filed a motion to withdraw as counsel and to substitute Christopher Donovan. A consent order allowing the withdrawal and substitution was entered on July 3, 2012. Ms. Foster responded in opposition to the motion for summary judgment on July 18, 2012, and

2

the motion to dismiss on August 15, 2012. On September 18, 2012, the trial court denied MHC's motions for summary judgment and to dismiss. On November 30, 2012, Ms. Foster filed her own motion for summary judgment, which relied on several documents, including an affidavit provided by Ms. Foster. On March 6, 2013, Ms. Foster's counsel filed a suggestion of death indicating that Ms. Foster died on March 1, 2013. On March 25, 2013, the trial court entered an order allowing the substitution of Appellant Stacey Foster-Henderson ("Appellant") in her capacity as the Personal Representative of the Estate of Ms. Foster as the plaintiff.

Due to Ms. Foster's death, MHC filed a motion to strike her affidavit on March 28, 2013. Appellant responded in opposition on April 12, 2013. In addition, Appellant filed a motion for sanctions against MHC due to the filing of the motion to strike, suggesting that the motion had no basis in law. On May 20, 2013, the trial court denied the motion for sanctions. On June 3, 2013, the trial court also denied MHC's motion to strike Ms. Foster's affidavit.

The case was heard without a jury on September 11, 2013. Ms. Foster's deposition was admitted as an exhibit. In her deposition, she denied that she ever received any notice of the termination of her employment. Instead, Ms. Foster testified that the only notice provided to her was a notice of suspension on April 29, 2005. Ms. Foster admitted that she eventually applied for and received unemployment benefits after she left MHC but testified that she did not apply for those benefits until 2006.

The parties stipulated to admission of several documents related to the termination of Ms. Foster's employment, including minutes from the Board. Relevant to this appeal, the record contains the April 29, 2005 letter suspending Ms. Foster pending the next Board meeting. The letter also informed Ms. Foster that if she had "any additional information . . . to share with the board or that . . . will assist the Board in making a final decision," Ms. Foster was permitted to attend the May 19, 2005 Board meeting to address the Board prior to a vote. According to the letter, Ms. Foster was "expected to present a detailed and comprehensive plan for corrective action to be put in place immediately."

Ms. Foster did not attend the May 19, 2005 meeting, instead preferring to address the Board through a written document. The minutes from the May 19, 2005 Board meeting do not include any discussion of Ms. Foster or her employment status. Instead, the record contains a letter dated May 23, 2005 from Loyal Featherstone, the Chairman of the Board, to Ms. Foster. The letter states:

> The Board [] has reviewed your letter to Chairman Featherstone dated May 19, 2005. We are troubled by the fact that you chose to personally bring your letter to [MHC] at 6:00

p.m. on the day of the meeting, but decided not to make an appearance before the board. Board members observed you drive away from the center just minutes before the start of our meeting, and you nor anyone else offered an explanation for your failure to appear.

In order for board members to hear your plan for corrective action directly from you, we have tabled a final decision on your employment status until our June 16th meeting. The board expects you to be present and to personally present your plans.

In the meantime, we have stopped the direct deposit of your payroll checks. You may retrieve them after your appearance before the Board.

The Board held another meeting on June 16, 2005. The minutes reflect that Ms. Foster was present and made a presentation before the Board. The minutes show that the Board convened an executive session to discuss and vote on the termination of another MHC employee's employment. Because the Board voted to terminate the employment of this individual, the minutes indicate that a letter notifying the employee of the termination would be sent by registered mail. The minutes do not indicate that an executive session was convened to vote on Ms. Foster's continued employment.

MHC sent a letter to Ms. Foster on June 22, 2005. The letter indicated that Ms. Foster's payroll check was enclosed, which reflected three days of approved administrative leave. However, the letter indicated that Ms. Foster's leave during the period of May 19, 2005 to June 16, 2005 was unapproved and that she would not be compensated for that time. In addition, the letter stated:

Frankly, your failure to appear at the May 19, 2005 board meeting without communicating any reason to Board Members is tantamount to job abandonment. Any further incidents of a similar nature will be grounds for immediate termination.

Upon your appearance at the June 16, 2005 board meeting, your regular pay was reinstated. The new pay period began on June 20, 2005, and you will be paid for each workday until a decision is made regarding your employment status.

The Board held a "Special Call Meeting" on July 14, 2005. According to the minutes, one of the purposes of the July 14, 2005 meeting was "discuss the employment status" of Ms. Foster. The minutes also state: "**Suspension of Ms. Marion Foster:** Ms. Foster is to be offered three months pay and release."

Another Board meeting was held on July 21, 2005. The record contains two versions of the minutes from the July 21, 2005 Board meeting—a signed and an unsigned copy, both of which were admitted as exhibits. According to the signed copy of the minutes, at the meeting, the Board "raised questions regarding the status of . . . Ms. Foster." The minutes reflect that an attorney informed the Board that Ms. Foster had an employment contract. The minutes go on to discuss a possible offer by the Board to reemploy another employee that was also suspended.[1] The minutes further state: "When questioned about Ms. Foster's status [a board member] reiterated that Ms. Foster's position was not to be rescinded. [Another board member] stated that she has been out for three months and will be offered three remaining months in pay."

An additional Board meeting occurred on August 18, 2005. During this meeting, Ms. Foster was again discussed. The meeting minutes state:

> [The Board's attorney] stated she received a call from Ms. Foster['s] . . . Attorney . . . . She cited letter and opinions reflecting her position on these former employees. [Ms. Foster's attorney] will be called and informed the Board had a pressing agenda which caused them to table the employee issue until the next meeting.

Another meeting occurred on September 15, 2005, in which Ms. Foster's employment status was again discussed. According to the meeting minutes:

> [A Board member] requested latest information regarding the employment status of . . . Ms. Foster. . . . Sharing the [legal counsel's] legal brief and comments by [the Board's attorney], [the Board Member] noted the absence of details. . . . It was noted [the Board's attorney] is requesting additional information on . . . Ms. Foster.

---

[1] The unsigned minutes provide significantly more detail regarding this discussion. According to these minutes, Board members generally did not want to reemploy this employee, a physician, but were concerned about breaching the physician's employment contract. The Board also expressed concern regarding its contractual obligation to pay the physician six month's salary upon termination.

> After discussion it was concluded no more information is available and a definitive decision on this matter is needed. Possible negotiations with legal counsel or otherwise should be arranged. However, their contracts are bonafide. It was recommended . . . to move forward with termination and work out the terms later. [The Board] voted to support termination. Follow-up is needed on this matter.

Finally, on October 20, 2005, a final Board meeting occurred in which Ms. Foster's employment status was discussed. According to the meeting minutes, "Notification has been given to . . . M[s.] Foster and [her] attorney. Dates (April-October, 2005) regarding outstanding payments were reconciled and payments made which includes the checks that were being held."

Marilyn Burress, who testified as MHC's keeper of records and who was the director of grants, marketing, and community development at the time of trial, testified as to her recollection of the events surrounding the termination of Ms. Foster's employment. When asked about the July 21, 2005 minutes that indicate that the Board was not going to rescind the decision concerning Ms. Foster, Ms. Burress indicated that it was her "understanding that they were not going to rescind their position not to bring her back as [Chief Operating Officer]."

Judge Deborah Henderson was also called to testify on behalf of MHC over the objection of Appellant. Prior to being elected General Sessions Judge, Judge Henderson served as the special master overseeing MHC's receivership. According to Judge Henderson, after a site inspection revealed numerous inadequacies at MHC, Ms. Foster was placed on suspension. According to Judge Henderson, when Ms. Foster failed to appear at the May 19, 2005 Board meeting, the Board "decided her services should be terminated." Judge Henderson testified that soon after the May 19, 2005 meeting, a letter was drafted informing Ms. Foster of the termination of her employment, but Judge Henderson was unable to consistently testify that the letter was ever mailed to Ms. Foster. After being shown some of the letters referenced above, Judge Henderson admitted that she did not "recall the events happening the way [the letters] sa[y] [they] did." Indeed, Judge Henderson admitted that the only letter in the record sent shortly after the May 19, 2005 Board meeting indicates that, rather than voting to terminate Ms. Foster's employment, the Board "tabled a final decision." With regard to this letter, Judge Henderson testified that "It would appear that as of May 23 the [B]oard obviously decided not to make a final decision." Judge Henderson also agreed that the June 22, 2005 letter suggested that Ms. Foster was still employed with MHC at that time. Regardless of these letters, Judge Henderson maintained that Ms. Foster's employment was terminated at the May 19, 2005 Board meeting.

Lois Stockton, the current Board chair at MHC also testified about the termination of Ms. Foster's employment. Again, Ms. Stockton testified that it was her belief that the Board voted to terminate Ms. Foster's employment at the May 19, 2005 meeting but admitted that it was possible that "nothing actually took place" due to the chaotic atmosphere surrounding MHC at the time. Ms. Stockton admitted that her memory of that time was not flawless.

At the conclusion of trial, the trial court orally ruled that Ms. Foster's employment was terminated in approximately June 2005. The trial court specifically found that the April 25, 2005 notice of suspension was insufficient to constitute notice of termination. Therefore, the court ruled that she was entitled to two months' additional salary, or $13,230.00, in damages. A final judgment was entered on September 26, 2013.[2] On October 15, 2013, Appellant filed a Rule 59.06 motion for new trial. On October 22, 2013, Ms. Foster filed a notice of appeal ("first appeal"). The trial court denied the motion for new trial on the basis of a lack of jurisdiction on November 15, 2013. On November 18, 2013, Appellant filed a Stipulation of Dismissal with prejudice of the first appeal, which was joined by MHC.

On November 20, 2013, Appellant filed a motion for a new trial pursuant to Rule 60.02 of the Tennessee Rules of Civil Procedure. Appellant filed a second notice of appeal on December 13, 2013. The trial court denied the request for a new trial on December 16, 2013.

On July 24, 2014, MHC filed a motion to dismiss Appellant's appeal. Specifically, MHC argued that because the first appeal was dismissed with prejudice, any issues raised in Appellant's second appeal are *res judicata*. On October 6, 2014, this Court entered an order denying MHC's motion. In addition, this Court indicated that because the trial court failed to rule on Appellant's requests for prejudgment interest and damages equivalent to lost benefits, the trial court's judgment was not final. Because this Court typically only has jurisdiction over final judgments, this Court directed Appellant to obtain a final order in the trial court adjudicating these claims. The trial court entered an order on October 13, 2014, adjudicating

---

[2] The trial court's final written order contains no findings of fact or conclusions of law of any kind to support the trial court's ruling. As we have repeatedly stated, this practice violates Rule 52.01 of the Tennessee Rules of Civil Procedure, which requires written findings of fact and conclusions of law in a final judgment resulting from bench trials. *See* Tenn. R. Civ. P. 52.01 ("In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment.") Typically, we would vacate the judgment and remand for further findings in this situation. *See* **Lake v. Haynes**, No. W2010-00294-COA-R3-CV, 2011 WL 2361563, at *1 (Tenn. Ct. App. June 9, 2011). However, because the trial court's reasoning is somewhat evident from its oral pronouncements, we exercise our discretion to proceed to consider the merits of this appeal. *See* **Hanson v. J.C. Hobbs Co., Inc.**, No. W2011-02523-COA-R3-CV, 2012 WL 5873582, at *10 (Tenn. Ct. App. Nov.21, 2012) (indicating that we may "solider on" with our review when the trial court's reasoning is "readily ascertainable"). Still, we caution litigants that we may not choose to so in the future.

the pending claims. Accordingly, this Court is satisfied that it has jurisdiction to consider this appeal.

## Issues Presented

Appellant raises several issues, which are taken, and slightly restated, from her appellate brief:

1. Whether the great weight of the documentary evidence preponderates against the trial court's finding of fact that Marion Foster was terminated on or about June 15, 2005.
2. Whether the trial court erred as a matter of law in failing to distinguish between (1) a private decision to terminate; and (2) the requisite notification of such decision to the Employee.
3. Whether the evidence preponderates against the trial court's implicit finding of fact that Ms. Foster received notice of her termination at the same time a private decision to terminate was allegedly made.
4. Whether the trial court erred in allowing a sitting Shelby County General Sessions judge to testify in favor of MHC, in the face of her own testimony that multiple witnesses existed competent to testify concerning the given topic.
5. Whether the trial court erred in failing to award pre-judgment interest for the approximately six and one-quarter (6 ¼) years during which MHC deprived Appellant of funds to which she was entitled.

In the posture of Appellee, MHC raises an additional issue. As we perceive it, MHC argues that this Court cannot consider the issues raised in Appellant's appeal due to the dismissal with prejudice of her first notice of appeal.

## Analysis

### Effect of Dismissal with Prejudice of First Appeal

In its brief to this Court, MHC again argues that the dismissal with prejudice of Appellant's first notice of appeal prevents this Court from considering the issues raised in Appellant's appeal. As previously discussed, the trial court entered a purported final judgment on September 26, 2013. Appellant filed a notice of appeal but later filed a stipulation of dismissal with prejudice. Appellant then filed a Rule 60.02 motion for a new trial. Before the trial court ruled on that motion, Appellant filed a second notice of appeal. Thereafter, the trial court denied the Rule 60.02 motion. Many months later, the trial court

8

also entered an order denying Appellant's requests for prejudgment interest and damages equivalent to lost benefits.

To support its position that this Court can no longer consider the issues raised in this appeal, MHC cites this Court's Opinion in ***Brown v. Brown***, No. M2012-02084-COA-R3CV, 2014 WL 1017509 (Tenn. Ct. App. Mar. 13, 2014), perm. app. denied (Tenn. Sept. 18, 2014). In ***Brown***, the trial court denied husband's motion to set aside a final judgment pursuant to Rule 60.02 of the Tennessee Rules of Civil Procedure.[3] ***Id.*** at *1. Husband subsequently appealed but later dismissed his appeal with prejudice. The trial court then set aside its denial of the Rule 60.02 motion and entered an order in Husband's favor. ***Id.*** at *3–*4. Wife then appealed, and this Court reversed, holding that the effect of the dismissal with prejudice of husband's first appeal was to "affirm the trial court's denial of the husband's Rule 60.02 motion, so the trial court was precluded under the law of the case doctrine from reconsidering its earlier denial of the Rule 60.02 motion." ***Id.*** at *8.

The ***Brown*** Opinion is readily distinguishable in the case at bar. Specifically, in ***Brown***, husband argued that despite his notice of appeal, the trial court maintained continuing jurisdiction over the case due to the case's lack of finality. Rule 3 of the Tennessee Rules of Appellate Procedure provides that "if multiple parties or multiple claims for relief are involved in an action, any order that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties is not enforceable or appealable[.]" Except where otherwise provided, this Court only has subject matter jurisdiction over final orders. *See* ***Bayberry Assoc. v. Jones***, 783 S.W.2d 553, 559 (Tenn. 1990). Husband argued that because wife filed a response to his Rule 60.02 motion entitled "Answer and Counterclaim,"

---

[3] Rule 60.02 provides, in relevant part:

> On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (3) the judgment is void; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that a judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1) and (2) not more than one year after the judgment, order or proceeding was entered or taken. A motion under this Rule 60.02 does not affect the finality of a judgment or suspend its operation, but the court may enter an order suspending the operation of the judgment upon such terms as to bond and notice as to it shall seem proper pending the hearing of such motion.

and the trial court failed to rule on wife's counterclaim, the judgment was not final and the trial court had continuing jurisdiction.

The Court of Appeals did not disagree with husband's argument regarding the effect of a non-final judgment on husband's dismissed notice of appeal but instead concluded that wife did not actually file a counterclaim requesting relief from the trial court. According to the Court of Appeals, the pleading "was simply a response to Husband's Rule 60.02 motion. There was no complaint pending in the [trial court] to which a party would file either an answer or a counterclaim." *Id.* at *6. Moreover, the only relief sought was simply a request contingent on the granting of husband's relief; when husband's motion was denied, the "request for relief contained in [w]ife's responsive pleading was mooted." Accordingly, the Court of Appeals concluded that the denial of husband's Rule 60.02 motion was a final judgment from which an appeal lay. Because his first notice of appeal vested jurisdiction with the Court of Appeals, his decision to dismiss the appeal with prejudice precluded reconsideration of the denial of his Rule 60.02 motion. *Id.* at *8.

While husband's argument did not prevail in **Brown**, his rationale must prevail here. As previously discussed, the trial court's purported final order failed to rule on Appellant's requests for prejudgment interest and damages equivalent to lost benefits. Without ruling on these requests, the judgment was not final, and this Court never acquired jurisdiction over Appellant's appeal. *See* Tenn. R. App. P. 3(a). Thus, any order purporting to adjudicate Appellant's rights by the Court of Appeals is void. **Dishmon v. Shelby State Cmty. Coll.**, 15 S.W.3d 477, 480 (Tenn. Ct. App. 1999) ("Judgments or orders entered by courts without subject matter jurisdiction are void.") (citing **Brown v. Brown**, 198 Tenn. 600, 610, 281 S.W.2d 492, 497 (1955)). As such, the trial court retained jurisdiction to adjudicate these claims until it filed its October 13, 2014 final order. Thus, although filed prematurely, Appellant's second notice of appeal was timely and vests this Court with jurisdiction to consider the issues raised in her brief. *See* Tenn. R. App. P. 4(d) ("A prematurely filed notice of appeal shall be treated as filed after the entry of the judgment from which the appeal is taken and on the day thereof.").

### Termination of Ms. Foster's Employment

We next consider Appellant's argument that the trial court erred in finding that Ms. Foster was terminated in approximately June 2005. In an appeal from a bench trial, we review the trial court's findings of fact de novo with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). No presumption of correctness, however, attaches to the trial court's conclusions of law, and our review is de novo. **Blair v. Brownson**, 197 S.W.3d 681, 684 (Tenn. 2006) (citing **Bowden v. Ward**, 27 S.W.3d 913, 916 (Tenn. 2000)). In this case, the trial court's order contains no findings of fact and

conclusions of law.[4] Where the trial court does not make findings of fact, there is no presumption of correctness, and we "must conduct our own independent review of the record to determine where the preponderance of the evidence lies." ***Brooks v. Brooks***, 992 S.W.2d 403, 405 (Tenn. 1999).

According to Appellant, the documentary evidence in the record clearly shows that the Board did not finalize any decision to terminate Ms. Foster's employment until the September 15, 2005 Board meeting. Thus, Appellant argues that Ms. Foster did not receive notice of the termination until after that date and that she is entitled to an award equivalent to six months of Ms. Foster's salary.

In contrast, MHC argues that the evidence in the record supports the trial court's finding that the termination of Ms. Foster's employment occurred no later than June 2005. According to MHC, the testimony of Ms. Burress, Judge Henderson, and Ms. Stockton all indicate that the Board voted to terminate Ms. Foster's employment when she failed to attend the May 15, 2005 meeting. In addition, MHC argues that notification was promptly sent to Ms. Foster regarding the termination. In the alternative, MHC argues that notice was not a precondition to termination in Ms. Foster's employment contract.

Because this issue involves the interpretation of a contract, we must first consider the applicable rules of contract interpretation. According to the Tennessee Supreme Court:

> The canons of contract construction direct us to first look to the plain language of the contract and to ascertain and effectuate the parties' intent as reflected in that language. ***Guiliano v. Cleo, Inc.***, 995 S.W.2d 88, 95 (Tenn. 1999). Our focus is on the four corners of the entire contract, the circumstances in which the contract was made, and the parties' actions in fulfilling their contractual obligations. ***Hughes v. New Life Dev. Corp.***, 387 S.W.3d 453, 465 (Tenn. 2012).
>
> If the contractual language is clear and unambiguous, the literal meaning of the contract controls the dispute*, Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008), and

---

[4] In its brief, MHC argues that the trial court's findings are entitled to a presumption of correctness on appeal and that many of the trial court's rulings rest on credibility. It is true that factual findings are entitled to a presumption of correctness, *see* Tenn. R. App. P. 13(d), and credibility findings may not be overturned without clear and convincing evidence to the contrary. *See* ***Franklin County Bd. Of Educ. v. Crabtree***, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) (citing ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002)). The trial court's order, however, contains neither factual findings nor credibility findings that are subject to such deference. *See* ***Alexander v. JB Partners***, 380 S.W.3d 772, 777 (Tenn. Ct. App. 2011) ("It is well settled, however, that a court speaks through its orders and not through the transcript.").

the language used in the contract is construed using its "plain, ordinary, and popular sense." ***Bob Pearsall Motors v. Regal Chrysler-Plymouth, Inc.***, 521 S.W.2d 578, 580 (Tenn. 1975). If, however, contractual provisions prove to be ambiguous (where more than one reasonable interpretation of the provision exists), the courts will employ other rules of contract construction to determine the parties' intent. ***Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.***, 395 S.W.3d 653, 659 (Tenn. 2013). One of these principles is that ambiguous contract provisions will be construed against the drafter of the contract. ***Kiser v. Wolfe***, 353 S.W.3d 741, 748 (Tenn. 2011); ***Betts v. Tom Wade Gin***, 810 S.W.2d 140, 143 n.4 (Tenn. 1991).

. . . The interpretation of a written contract is [] a question of law. Accordingly, we review these questions de novo without a presumption of correctness. . . . ***BSG, LLC v. Check Velocity, Inc.***, 395 S.W.3d 90, 92 (Tenn. 2012) (interpretation of written contracts).

***West v. Shelby Cnty. Healthcare Corp.***, 459 S.W.3d 33, 41–42 (Tenn. 2014). Thus, we turn to the language of Ms. Foster's employment contract.

As previously discussed, Ms. Foster's contract provides, in pertinent part:

This Agreement may be terminated by the mutual assent of the parties hereto; or by election by MHC or the Employee with sixty days advanced notice.

MHC may terminate this Agreement with or without cause at any time and shall be obligated to pay Employee the compensation the equivalent of six (6) months salary, plus accrued vacation and other employee benefits up to the date of termination.

The parties do not dispute that the above contract entitled Ms. Foster to six months' additional compensation from the date of her termination. Indeed, the Tennessee Supreme Court has previously held that employment contracts whereby an employee is entitled to severance even if his or her employment is terminated for cause are permissible under Tennessee law. *See **Teter v. Republic Parking Sys., Inc.***, 181 S.W.3d 330, 344 (Tenn. 2005) (providing severance to the employee so long as the employee did not engage in "gross misconduct, fraud, embezzlement, theft, or voluntary termination"). Although unclear from

12

her brief, it appears that Appellant argues that the contract also entitled Ms. Foster to advance notice before the termination could become effective.

The above employment agreement provides that if the agreement is to be terminated unilaterally, the terminating party must provide "sixty days advanced notice" to the other party. Clearly, then, Ms. Foster's employment contract requires that she receive notice of any decision to terminate her employment contract by MHC. Thus, the Board was required to provide Ms. Foster advance notice of the termination prior to the termination becoming effective. In this situation, we must conclude that by the plain language of Ms. Foster's contract, "the date of termination" cannot occur until Ms. Foster has been provided the requisite notice to which she is clearly entitled. Accordingly, while the date that the Board voted to terminate Ms. Foster's employment is certainly relevant, the date upon which she received notice of the termination is dispositive of this appeal.

Here, Ms. Foster testified unequivocally that she was never provided any notice that her employment with MHC was terminated. Although the various witnesses for MHC all indicated their belief that termination occurred on May 15, 2005, none of the witnesses were able to offer any persuasive evidence regarding the notification sent to Ms. Foster. While Judge Henderson testified that a notification was mailed, she also testified that she was unsure if any notification was sent to Ms. Foster and that she did not mail any notification letters to Ms. Foster. Other witnesses likewise believed that notice was mailed but did not participate in the notification or witness any other individual actually provide notice to Ms. Foster.

Additionally, none of the documentary evidence in the record indicates that Ms. Foster received notice of the termination of her employment prior to October 2005. Importantly, despite MHC's contention otherwise, the minutes from the May 15, 2005 Board meeting do not support a finding that the Board voted to terminate Ms. Foster's employment on this date. Instead, these minutes show that the Board convened an executive session and voted to terminate the employment of a different employee; Ms. Foster is not even mentioned in the May 15, 2005 minutes. The record, however, does contain the April 25, 2005 letter suspending Ms. Foster's employment. However, the trial court orally ruled that this letter was insufficient to constitute notice of termination, and MHC has not appealed that finding.

The other letters contained in the record and the minutes of the Board likewise show that the decision to terminate Ms. Foster's employment was not likely finalized until September 15, 2005. For example, on June 22, 2005, Mr. Featherstone sent a letter to Ms. Foster indicating that her failure to attend the May 15, 2005 Board meeting was "tantamount to job abandonment" and that "further incidents of a similar nature will be grounds for immediate termination." Clearly, then, the Board had not finalized a decision to terminate Ms. Foster as of this date, and this letter clearly does not provide appropriate notice to Ms.

Foster that her employment had been terminated. Although the July 21, 2005 letter indicates that a decision regarding Ms. Foster's status was not to be rescinded, it is entirely unclear if this decision refers to the decision to suspend Ms. Foster or a decision to terminate her employment. Indeed, as late as the August 18, 2005 meeting, the Board indicates that it is "tabl[ing]" discussion on Ms. Foster's employment claims in favor of resolving more pressing matters. From our review of the record, the documentary evidence in the record supports Appellant's contention that a "definitive decision" concerning Ms. Foster's employment was not made until the September 15, 2005 Board meeting and that notification was not provided until sometime thereafter.

Based on the foregoing, the trial court erred in finding that Ms. Foster was only entitled to damages equivalent to two months' salary. From our review of the evidence, Ms. Foster was not notified of the termination of her employment until, at the earliest, September 16, 2005. Because she was entitled to sixty days' notice prior to the termination of her employment becoming effective and six months' salary after termination, we conclude MHC breached the employment contract. *See **Teter***, 181 S.W.3d at 339 (holding that employer would be in breach of the employment contract if severance was not paid to the employee in accordance with the contract). Appellant is, therefore, entitled to the full damages requested in the complaint, an amount equivalent to six months' salary.[5] Any question regarding the correctness of the trial court's decision to allow Judge Henderson to testify is, therefore, pretermitted.

### Prejudgment Interest

Appellant next argues that the trial court erred in denying Appellant's request for prejudgment interest. The award of prejudgment interest is governed by statute, specifically Tennessee Code Annotated Section 47-14-123. According to Section 47-14-123:

> Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum . . . .

An award of prejudgment interest is within the sound discretion of the trial court, and the decision will not be disturbed by an appellate court unless the record reveals an abuse of

---

[5] Although Ms. Foster's contract entitled her to compensation for lost benefits, the trial court denied such relief. Appellant does not raise the denial of that relief as an issue on appeal or otherwise argue that the trial court erred in denying such relief.

discretion. ***Spencer v. A-1 Crane Serv., Inc.***, 880 S.W.2d 938, 944 (Tenn. 1994); ***Otis v. Cambridge Mut. Fire Ins. Co.***, 850 S.W.2d 439, 446 (Tenn. 1992).

The Tennessee Supreme Court discussed prejudgment interest in detail in ***Myint v. Allstate Ins. Co.***, 970 S.W.2d 920 (Tenn. 1998):

> Several principles guide trial courts in exercising their discretion to award or deny prejudgment interest. Foremost are the principles of equity. Tenn. Code Ann. § 47-14-123. Simply stated, the court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case. In reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing. ***Mitchell v. Mitchell***, 876 S.W.2d 830, 832 (Tenn.1994); ***Otis***, 850 S.W.2d at 446.
>
> In addition to the principles of equity, two other criteria have emerged from Tennessee common law. The first criterion provides that prejudgment interest is allowed when the amount of the obligation is certain, or can be ascertained by a proper accounting, and the amount is not disputed on reasonable grounds. ***Mitchell***, 876 S.W.2d at 832. The second provides that interest is allowed when the existence of the obligation itself is not disputed on reasonable grounds. ***Id.*** (citing ***Textile Workers Union v. Brookside Mills, Inc.***, 205 Tenn. 394, 402, 326 S.W.2d 671, 675 (1959)).We note that these criteria, if strictly construed, could prohibit the recovery of prejudgment interest in the vast majority of cases. Indeed, only a liquidated claim, for which prejudgment interest is already recoverable as a matter of right under Tenn. Code Ann. § 47-14-109, can truly be considered an obligation of certain and indisputable amount. Further, it is safe to say that, at trial, defendants usually can articulate at least one good reason for disputing the existence of the obligation, for were it otherwise, defendants would rarely survive summary judgment. Finally, the focus on whether the defendant had a reasonable defense ignores the principle that prejudgment interest is not a penalty imposed on the defendant for indefensible conduct.

15

Not surprisingly, an analysis of relevant case law reveals that these criteria have not been used to deny prejudgment interest in every case where the defendant reasonably disputed the existence or amount of an obligation. More typically, courts either use the certainty of a claim as support for an award of prejudgment interest, or they do not discuss the certainty of the claim at all. *See, e.g., Mitchell*, 876 S.W.2d at 832 (allowing the award of interest where the existence and amount of the obligation under a settlement agreement were not reasonably disputed); *Otis*, 850 S.W.2d at 446 (allowing the award of interest to a plaintiff whose right to recover under a fire insurance contract was reasonably disputed on the grounds of arson and misrepresentation); *Performance Systems, Inc. v. First American Nat. Bank*, 554 S.W.2d 616, 619 (Tenn. 1977) (allowing the award of interest, although the existence of the defendant's obligation under the lease was reasonably disputed); *Johnson v. Tennessee Farmers Mut. Ins. Co.*, 556 S.W.2d 750, 752 (Tenn. 1977) (allowing the award of interest, although the amount of recovery under the insurance claim was reasonably disputed); *Uhlhorn v. Keltner*, 723 S.W.2d 131, 138 (Tenn. App. 1986) (allowing award of interest in a boundary dispute case, where the existence of any obligation to pay rent and the amount of rent due were both reasonably disputed); *Schoen v. J.C. Bradford & Co.*, 667 S.W.2d 97, 101–02 (Tenn. App. 1984)(rejecting argument that prejudgment interest should not be imposed when defendant appealed in good faith).

Thus, we find that if the existence or amount of an obligation is certain, this fact will help support an award of prejudgment interest as a matter of equity. After all, the more clear the fact that the plaintiff is entitled to compensatory damages, the more clear the fact that the plaintiff is also entitled to prejudgment interest as part of the compensatory damages. The converse, however, is not necessarily true. The uncertainty of either the existence or amount of an obligation does not mandate a denial of prejudgment interest, and a trial court's grant of such interest is not automatically an abuse of discretion, provided the decision was otherwise equitable. The certainty of the plaintiff's claim is but one of many nondispositive facts to consider when deciding whether prejudgment interest is, as a matter of law, equitable under the circumstances.

16

*Myint*, 970 S.W.2d at 927–28 (footnotes omitted).

Here, the only indication given by the trial court for the denial of prejudgment interest was the "uncertainty about what, if anything, [Ms. Foster] was entitled to and the fact that she was paid all those months without working, and really getting the benefit of [] additional [salary] because of perhaps poor record keeping." As discussed above, however, the uncertainty of Appellant's claim is insufficient to support the denial of a request for prejudgment interest. *Id.* at 928. Moreover, based upon our holding, *supra,* Ms. Foster's continued employment and MHC's corresponding obligation to pay her stemmed not from any fault on the part of Ms. Foster but instead was the result of delay and poor record keeping on the part of MHC. To deny Appellant prejudgment interest on these bases is an abuse of discretion. *See **Gonsewski v. Gonsewski**,* 350 S.W.3d 99, 113 (Tenn. 2011) ("An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice.") (citing ***Wright ex rel. Wright v. Wright***, 337 S.W.3d 166, 176 (Tenn. 2011)). Thus, we must independently consider whether Appellant was entitled to an award of prejudgment interest. *See **Scholz v. S.B. Int'l, Inc.**,* 40 S.W.3d 78, 83 (Tenn. Ct. App. 2000) (concluding that the trial court applied an improper standard in denying prejudgment interest, but going on to consider the appropriate factors).

Appellant argues that she is entitled to prejudgment interest because she lost the benefit of monies to which she was entitled for over six years. In contrast, MHC argues that it would inequitable to award prejudgment interest due to the substantial delays in resolving the matter caused by Appellant. According to this Court:

> [T]he Tennessee Supreme Court has shifted the balance to favor awarding prejudgment interest whenever doing so will more fully compensate plaintiffs for the loss of use of their funds. Fairness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received. ***Levien v. Sinclair Oil Corp.***, 314 A.2d 216, 221 (Del. Ch. 1973); ***King v. State Roads Comm'n***, 298 Md. 80, 467 A.2d 1032, 1035 (1983); ***Erin Rancho Motels v. United States Fidelity & Guar. Co.***, 218 Neb. 9, 352 N.W.2d 561, 566 (1984) (Shanahan, J., concurring and dissenting in part). That is not to say that trial courts must grant prejudgment interest in absolutely every case. Prejudgment interest may at times be inappropriate such as (1) when the party seeking

17

> prejudgment interest has been so inexcusably dilatory in pursuing a claim that consideration of a claim based on loss of use of the money would have little weight, ***R.E.M. v. R.C.M.***, 804 S.W.2d 813, 814 (Mo. Ct. App. 1991); (2) when the party seeking prejudgment interest has unreasonably delayed the proceedings after suit was filed, ***Batchelder v. Tweedie***, 294 A.2d 443, 444 (Me. 1972); or (3) when the party seeking prejudgment interest has already been otherwise compensated for the lost time value of its money. ***Braswell v. City of El Dorado***, 187 F.3d 954, 957 (8th Cir.1999); ***Perlman v. Zell***, 185 F.3d 850, 857 (7th Cir. 1999).

***Scholz***, 40 S.W.3d at 83.

Several courts have considered the question of what level of delay or dilatory conduct renders prejudgment interest inappropriate. For example, in ***Story v. Lanier***, 166 S.W.3d 167 (Tenn. Ct. App. 2004), the Court of Appeals concluded that a thirty-year delay was a sufficient reason to deny prejudgment interest. ***Id.*** at 182. Others cases have awarded prejudgment interest even in the face of delays, especially where the delay was not wholly attributable to the plaintiff's conduct. For instance, in ***General Construction Contractors Assocation, Inc. v. Greater St. Thomas Baptist Church***, 107 S.W.3d 513 (Tenn. Ct. App. 2002), the Court of Appeals allowed full prejudgment interest, even during a nineteen-month delay between the trial and the entry of the order. ***Id.*** at 526. Likewise in ***Christmas Lumber Co. v. Valiga***, 99 S.W.3d 585 (Tenn. Ct. App. 2002), the Court of Appeals noted that the case had been delayed for ten years but concluded that the record failed to establish who was at fault for the delay, the plaintiff or the defendant. ***Id.*** at 596. Accordingly, the Court of Appeals ruled that an award of prejudgment interest was appropriate. ***Id.*** Finally, in ***Wilder v. Tennessee Farmers Mutual Insurance Co.***, 912 S.W.2d 722 (Tenn. Ct. App. 1995), the Court of Appeals awarded only partial prejudgment interest to account for a delay in the final judgment caused by the trial court. ***Id.*** at 727.[6]

Here, MHC filed a motion to dismiss indicating that Appellant took no action on the case after June 10, 2010. From the record, it does not appear that Appellant resumed active participation in the case until her current attorney entered a notice of appearance on July 28, 2012. Appellant thereafter filed a response to the motion to dismiss alleging that any delays on the part of Appellant's former counsel were "non-volitional" and had not prejudiced MHC. Accordingly, Appellant does not appear to deny that there were some delays in prosecuting this case.

---

[6] Although ***Wilder*** was decided prior to the Tennessee Supreme Court's seminal Opinion in ***Myint***, it was cited favorably by the ***Myint*** Court. *See* ***Myint***, 970 S.W.2d at 929.

As previously discussed, the award of prejudgment interest is guided by the principles of equity. *See Myint*, 970 S.W.2d at 928. Equity is defined, in the popular sense, as "the quality of being equal or fair; fairness; impartiality; even-handed dealing." *Garner's Dictionary of Legal Usage* 323 (3d ed. 2011). Here, we have found that the evidence preponderates in favor of a finding that either: (1) Ms. Foster never received the notice of the termination of her employment that she was entitled to receive; or (2) MHC wrongfully withheld additional compensation from Ms. Foster despite the fact that Ms. Foster did not receive notice of the termination of her employment until September or October 2005. Under either circumstance, MHC clearly breached the contract of employment with Ms. Foster and wrongfully deprived her of funds to which she was entitled. On the other hand, however, this case was substantially delayed by Appellant, regardless of how "non-volitional" that delay might have been. In addition, to award prejudgment interest during such delay is surely to cause the prejudice to MHC that Appellant argued would not occur by allowing the case to continue in spite of MHC's motion to dismiss for lack of prosecution. Under these circumstances, we conclude that the equitable path is to award prejudgment interest to Appellant from the date of the filing of the complaint, May 22, 2007. However, the award of prejudgment interest shall exclude the period from June 10, 2010, when Appellant discontinued active participation in the case, to July 3, 2012, when Appellant's current counsel was substituted for Ms. Foster's initial attorney.

## Conclusion

The judgment of the Chancery Court of Shelby County is reversed. This cause is remanded to the trial court for the calculation of Appellant's damages, amounting to the equivalent to six months of Ms. Foster's salary. On remand the trial court shall also calculate the amount of Appellant's prejudgment interest and convene any other necessary proceedings in accordance with this Opinion. Costs of this appeal are taxed to Appellee Memphis Health Center, Incorporated, for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE

19