IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 19, 2022 Session

## BLACKTHORN HOUSE, LLC v. FIRST VOLUNTEER BANK

**Appeal from the Chancery Court for Hamilton County**
**No. 19-0496  Jeffrey M. Atherton, Chancellor**

_____

### No. E2021-00346-COA-R3-CV
_____

This dispute involves a lender bank's deed of trust for a leasehold interest related to real property on Lookout Mountain, Tennessee. After the trial court found, inter alia, that the deed of trust was no longer in effect and the bank's interest in it ceased when the lease terminated, the lender appealed.  The contractual issues before us are between the lender bank and the borrower's landlord.  We affirm the ruling of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which D. Michael Swiney, C.J., and Kristi M. Davis, J., joined.

Tracy C. Wooden, Chattanooga, Tennessee, for the appellant, First Volunteer Bank of Tennessee.

William H. Horton and Carol M. Ballard, Chattanooga, Tennessee, for the appellee, Blackthorn House, LLC.

## OPINION

### I. BACKGROUND

This case concerns real property located at 124 North Watauga Lane, Lookout Mountain, Tennessee (the "Property"). Appellee, Blackthorn House, LLC ("Blackthorn House"), owns the Property. Appellant, First Volunteer Bank ("FVB") has a leasehold interest on the Property.

On April 1, 2008, Blackthorn House's predecessor, Beltline at Howell Hill LLC ("Beltline"), as landlord, and Hollin Williams, as tenant, executed a twenty-year ground lease of the Property with three five-year options to extend ("Ground Lease"). The Ground Lease includes a provision granting the landlord a security interest in the tenant's personal property on the Property to secure rent ("Lien on Personal Property"). Mr. Williams operated a grocery store at the Property called "Mountain Market."

Blackthorn House acquired the Property from Beltline in 2008 and succeeded to Beltline's interest in the Ground Lease, including the Lien on Personal Property. On May 30, 2011, Williams assigned all his right, title, and interest in and to the Ground Lease to TSBB I, LLC, ("TSBB") via the Tenant Assignment and Assumption of Lease in connection with TSBB's acquisition of the assets of the Mountain Market grocery store. On June 6, 2011, Blackthorn House executed a Consent and Acceptance of the Tenant Assignment and Assumption of Lease.

At the time of the asset purchase, FVB's predecessor in interest, Gateway Bank & Trust ("Gateway Bank") extended a loan of $413,000 to TSBB for "general business assets financing" (the "Loan").[1] TSBB executed a Deed of Trust for Leasehold Interest with Gateway Bank to secure the Loan (the "Deed of Trust").[2] The Deed of Trust, entered on June 9, 2011, required TSBB to "keep current and in good standing any and all lease agreements by and between Grantor [TSBB] and Blackthorn House, LLC . . . ." Blackthorn House was not a party to the Deed of Trust.

A Commercial Security Agreement was executed that granted a security interest in collateral to further secure the Loan. The collateral included TSBB's accounts, contract rights, guarantees, personal property, machinery, tools, equipment, furnishings, books and records, and other tangible and intangible property rights under the Uniform Commercial Code ("UCC"). This Commercial Security Agreement, as a UCC Article 9 agreement, did not have any effect on any interest in real property, including any interest in the Property. Thus, it did not include the building, fixtures, or improvements considered to be permanent, but it did include the coolers, refrigeration, freezers and shelving. The original Loan also provided for guaranties of several well-off local individuals. However, Alexis Tarumianz testified at trial that he is now the sole member of TSBB.

Around this same time, Blackthorn House and TSBB entered into an amendment to the Ground Lease ("First Amendment to the Ground Lease") that extinguished two of the five-year lease extension options while preserving the first five-year option. Gateway Bank was not a party to the First Amendment to the Ground Lease. The amendment recognized that Blackthorn House was "the sole owner of the Building on the property." In addition, representatives of both Blackthorn House and Gateway Bank executed a Lien

---

[1] The original maturity date of the loan was May 20, 2016.

[2] FVB's Jerry Lee stated in his deposition that a security interest in a lease was rare.

Subordination Agreement ("Lien Subordination Agreement"). TSBB indicated its approval by signing the Lien Subordination Agreement as the tenant. The Lien Subordination Agreement noted that "[Blackthorn House] is willing to subordinate its lien in the Collateral to the lien of the deed of trust to be granted for the benefit of [Gateway Bank] in connection with the [Loan]." Collateral, as used in the Lien Subordination Agreement, is defined as to include furnishings, equipment, and other personalty of the tenant to be placed on the Property ("Collateral"). Thus, the Lien Subordination Agreement subordinated Blackthorn House's Lien on Personal Property to Gateway Bank's Deed of Trust.

Section 3 of the Lien Subordination Agreement provides that "Lender shall be entitled to the same notice and cure rights as to which Tenant is entitled under Section 20(a) of the [Ground Lease]." Section 20(a) of the Ground Lease gives the tenant five days following written notice to cure failure to pay rent and ten days following written notice for failure to perform any other obligation under the Ground Lease. Section 6 of the Lien Subordination Agreement further provides that "[t]his Agreement is binding upon and inures to the benefit of each assignee and personal representative of Landlord and each assignee and successor of Lender." In 2012, FVB acquired Gateway Bank and its loans and interest in property.

In 2015, TSBB challenged the annual rental increase clause in the Ground Lease, asserting that a rent concession and term reduction was necessary in order for TSBB to continue operating the business. On March 31, 2016, Blackthorn House and TSBB entered into a second lease amendment of the Ground Lease ("Second Lease Amendment"). The Second Lease Amendment reduced the rent and decreased the original term from 20 years to a term that ended on March 31, 2019, with options. Any option to extend the Ground Lease beyond March 31, 2019, had to be exercised by written notice at least one year prior to the termination of the original term. Either party was allowed to terminate it upon 90 days' notice.

The Second Lease Amendment acknowledged FVB's security interest and stated in its entirety that

> The Parties acknowledge that First Volunteer Bank has a security interest in the Lease as security for a loan that First Volunteer Bank made to TSBB and that such security interest, including all rights and obligations that First Volunteer Bank has under the Lease pursuant to the security interest, shall not be affected or modified by this Lease Amendment. The reduction in rent effected by this Lease Amendment shall be personal as to TSBB, and no other party. In the event that First Volunteer Bank (or its successors or assigns (the "Bank")) shall exercise the rights granted to it under the Deed of Trust from TSBB (including any extension or modification of the same), then the Bank shall be responsible for payment of rent under the terms of the Lease without any reduction, the 5% annual escalation to be applied retroactively to April

1, 2016.

FVB executed a consent to the Second Lease Amendment. FVB's representative, Jerry Lee, testified that he did not want to sign off on the Second Lease Amendment, but Mr. Tarumianz informed him that TSBB could not continue as a tenant without the agreement.

On May 19, 2016, FVB and TSBB entered into a Change in Terms Agreement to revise the terms of the Loan. The maturity date was extended from May 20, 2016, to May 20, 2019, the monthly payments were reduced, and the interest rate was reduced to 1%.

Despite FVB now contending "alleged defaults on unpaid amounts . . . apparently began around 2010 and continued throughout the term of the lease as well as alleged defaults related to deferred maintenance problems in 2011 and throughout the lease," Blackthorn House took no action to terminate TSBB's Ground Lease prior to the termination date for any default.[3] Charles Whitener, testifying at trial on behalf of Blackthorn House, stated that Blackthorn House never provided FVB notice and an opportunity to cure because there was nothing to cure.

In early 2019, prior to the termination date of TSBB's lease, Blackthorn House contacted FVB to discuss what FVB desired to do given the impending termination date of the Ground Lease. According to Blackthorn House, it offered to let FVB take over TSBB's Lease in lieu of foreclosure, provided that the back rent and rent escalator required by the Second Lease Amendment was paid. Blackthorn House also offered for FVB to purchase the Property. Mr. Whitener testified that he

> contacted Jerry Lee at First Volunteer to see if the bank wanted to assume a tenant's position and try to sublease the property. I also offered to sell the Property to the bank at a discount price. The bank declined and simply encouraged negotiations for a new lease with TSBB.

Blackthorn House informed FVB that it had no desire to sign a new lease with TSBB, and that TSBB's lease was terminating. FVB asserts that it was not truly provided an opportunity to cure because Blackthorn House

> demanded that the Bank execute a new lease with market rents and other terms acceptable to the owner. Additionally, Charles Whitener told Jerry Lee

---

[3] However, on July 6, 2018, Blackthorn House did send notice of potential default to TSBB and FVB for TSBB's failure to comply with maintenance obligations. Seeking to protect both Blackthorn House and FVB's interest in the Property, Blackthorn House provided FVB both notice of this potential default and the right to cure the default pursuant to the Lien Subordination Agreement. In that letter, Blackthorn House asserted that FVB "is obligated to Landlord for full rent and other charges under the Ground Lease as outlined in the Lease Amendment dated March 3, 2016 and consented to by First Volunteer (the "Lease Amendment")."

that Blackthorn House, LLC would not accept rent payments from the Bank and that Blackthorn House, LLC would return such payments back to the Bank if they were sent.

No written notice to exercise the option to renew the Ground Lease was provided prior to the Termination Date of March 31, 2019. No new agreement was executed. However, TSBB remained in possession of the Property after the March 31, 2019 termination date; Blackthorn House considered TSBB a month-to-month tenant from that point forward. FVB was notified of the termination of the Ground Lease. Despite FVB's request that the parties work out a new agreement, on April 12, 2019, Blackthorn House demanded by letter that TSBB vacate the Property.

On April 22, 2019, Blackthorn House's attorney, Bill Horton, sent a letter to Mr. Lee at FVB noting that TSBB was "in default status" as a holdover tenant. The letter further provided that Blackthorn House was "willing to discuss execution of a new lease with [FVB] with a term and other conditions as may be agreed upon by the parties." According to Mr. Horton, in his view, if FVB foreclosed on its leasehold lien, "it will stand in the shoes of the tenant which means that Bank will be a tenant at will."

On April 29, 2019, Mr. Horton sent an email to Mr. Lee stating that "for your information, the lease rent has been about 2.14 per foot and is just not sustainable for the building. I think the client will move forward with putting the property up for sale." The next day, April 30, 2019, Mr. Horton emailed FVB's attorney to say

> It is clear to me that the bank would have no security interest in a leasehold interest if there is no lease. The lease terminated. The tenant would not negotiate a new lease for market terms and did not exercise any options to extend the lease.
> . . .
> Lex,[4] acting pro se, called me and said that the bank is "taking over the lease" and he would just simply sublease from the bank. Exactly how this would be done is a mystery to the owner. The owner would not accept or agree to this unless the Bank wants to negotiate a new lease with market rents and other terms acceptable to the owner. . . .

On May 20, 2019, Blackthorn House and TSBB executed the Lease Termination Agreement, in which TSBB acknowledged that it had been a tenant at will since March 31, 2019, and agreed to vacate the Property on or before May 31, 2019. FVB was provided a copy of the Lease Termination Agreement. TSBB subsequently vacated the Property on June 6, 2019, leaving behind equipment and unpaid rent.[5] From the record, it appears that

---

[4] Lex Tarumianz with TSBB.

[5] It appears that TSBB removed some of the equipment subject to FVB's lien for TSBB's new

- 5 -

the last payment on the Loan occurred on February 5, 2019. FVB never foreclosed on the Deed of Trust and never took any action to collect the remaining loan amount from the tenant.

On June 7, 2019, Blackthorn House requested that FVB sign a release of the Deed of Trust. An auction of the Property occurred the following day. Blackthorn House entered into a contract with a buyer for a high bid of $491,700. On June 11, 2019, Blackthorn House again requested that FVB release the Deed of Trust. When FVB would not do so, Blackthorn House was unable to deliver a clean title in order to close on the sale of the Property.

Blackthorn House filed its complaint on July 17, 2019. It primarily sought a declaratory judgment that (a) FVB's leasehold Deed of Trust was of no further force and effect due to the termination of the Ground Lease between TSBB and Blackthorn; (b) FVB was required to execute a recordable release of the deed of Trust; and (c) FVB or TSBB was required to remove the personal property remaining at the Property by a certain date. Additionally, Blackthorn House made claims for defamation of title, tortious interference with contract or business relationship, a claim for statutory penalty under Tennessee Code Annotated section 66-25-102, and for injunctive relief. On August 19, 2019, FVB filed an answer asserting affirmative defenses and its counterclaim for breach of contract against Blackthorn House and for an award of attorney's fees. FVB argued that it (a) had a valid security interest in the Lease (extending for the original lease term of twenty years plus the extensions); (b) was entitled to receive formal notice of the tenant's default and an "opportunity to cure;" and (c) Blackthorn House was required to provide formal notice of damages owed by TSBB and an "opportunity to cure." FVB contends that it has no first-hand knowledge or reliable factual basis of the costs owed because Blackthorn House did not provide it with a detailed itemization of damages claimed.

This matter was tried without a jury on September 15, 2020. FVB filed a Rule 15.02 Motion to Amend the Counterclaim to Conform to the Evidence on October 2, 2020, requesting leave to add a counterclaim against Blackthorn House for breach of the Second Lease Amendment. There was no formal ruling on this motion. Instead, on December 28, 2020, the trial court issued a Memorandum Opinion and Order in which it determined that (1) FVB's Deed of Trust was no longer in effect and its interest in the leasehold Deed of Trust ceased when the Lease terminated; (2) Blackthorn House was not entitled to relief under Tennessee Code Annotated section 66-25-102, or (3) under a defamation of title theory, or (4) under an interference with contract and business relations theory; and (5) FVB was not entitled to pursue its breach of contract counterclaim. After both Blackthorn House and FVB moved to Alter or Amend the court's Memorandum Opinion and Order, both motions were denied on March 24, 2021. FVB filed this timely appeal.

---

operations at a nearby location on Lookout Mountain under a new name.

## II. ISSUES

The issues raised on appeal are restated as follows:

1. Whether the trial court erred in failing to find a lender liable in damages for failure to release its leasehold deed of trust when the lease terminated.

2. Whether the trial court erred by not entering a ruling on FVB's Rule 15.02 Motion to Amend its Counterclaim to Conform to the Evidence at Trial.

3. Whether the trial court erred in failing to find that Blackthorn House breached the Second Lease Amendment that expressly acknowledged FVB's security interest in a lease agreement by refusing to provide FVB an opportunity to cure a default and to assume the lease agreement.

4. Whether the trial court erred in failing to find that Blackthorn House materially breached its Lien Subordination Agreement with FVB by failing to provide notice and opportunity to cure a default under a lease agreement that secured a loan owed to FVB.

5. Whether the trial court erred in finding that FVB did not mitigate its damages and by failing to award compensatory damages plus reasonable attorney's fees for Blackthorn House's breach of contract, together with FVB's attorney's fees on appeal.

6. Whether the trial court erred in failing to award attorney's fees to a property owner for its successful defense of a claim involving a contract with an attorney fee clause.

7. Whether Blackthorn House should receive its attorney's fees and costs for this appeal.

## III. STANDARD OF REVIEW

"In an appeal from a bench trial, we review the trial court's findings of fact de novo with a presumption of correctness, unless the evidence preponderates otherwise." *Foster–Henderson v. Memphis Health Ctr., Inc.*, 479 S.W.3d 214, 223 (Tenn. Ct. App. 2015) (citing Tenn. R. App. P. 13(d)). If the trial court has not made a specific finding of fact on a particular matter, we review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997). "[F]or the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect."

- 7 -

*Realty Shop, Inc. v. RR Westminster Holding, Inc.,* 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999).

"We also review the trial court's resolution on a question of law de novo, and no presumption of correctness attaches to the trial court's legal conclusions." *Tennessee Bank & Tr. v. Boruff*, No. M2021-00552-COA-R3-CV, 2022 WL 781048, at *4 (Tenn. Ct. App. Mar. 15, 2022) (citing *Bowden v. Ward,* 27 S.W.3d 913, 916 (Tenn. 2000)). "The interpretation of a contract is a matter of law that requires a de novo review on appeal." *Guiliano v. Cleo, Inc.,* 995 S.W.2d 88, 95 (Tenn. 1999) (citing *Hamblen Cnty. v. City of Morristown*, 656 S.W.2d 331, 335-336 (Tenn. 1983)). Similarly, whether a party has satisfied its duty to mitigate damages is a matter of law and must be reviewed de novo. *B.W. Byrd Metal Fabricators, Inc. v. Alcoa, Inc.,* No. E2018-01750-COA-R3-CV, 2019 WL 3889798, at *6 (Tenn. Ct. App. Aug. 19, 2019).

## IV. DISCUSSION

### a. Lien Subordination Agreement

FVB contends that Blackthorn House repudiated its right to the full lease term by not allowing FVB to assume the remainder of the Lease plus extensions. According to FVB, Blackthorn House realized the current rent amount was uneconomical and desired to sell the Property. Thus, FVB asserts the trial court erred in failing to find that Blackthorn House materially breached the Lien Subordination Agreement with FVB when it allegedly failed to provide notice and opportunity to cure a default under the Lease that secured the Loan owed to FVB. We hold that the trial court committed no error in deciding this issue.

The Lien Subordination Agreement, which provides that the landlord "subordinates any lien, security interest, pledge or assignment on, in or of, or any rights to receive, or any other rights or remedies relating to, the furniture, fixtures, equipment, appliances or personal property of Borrower located on the Property . . ." gives FVB the same notice and cure rights that TSBB had under Section 20(a) of the Ground Lease. Paragraph 3 states that "[FVB] shall be entitled to the same notice and cure rights as to which [TSBB] is entitled under Section 20(a) of the Lease." Section 20(a) of the Ground Lease unambiguously gives the tenant five days following written notice to cure failure to pay rent and ten days following written notice for failure to perform any other obligation under the Ground Lease. Accordingly, the Lien Subordination Agreement requires Blackthorn House to provide FVB notice and the opportunity to cure a failure to pay rent or a failure to perform any obligation under the Ground Lease. As observed by the trial court, the Lien Subordination Agreement subordinated the landlord's lien right to the same equipment granted in Ground Lease to secure the rent. The Agreement did not subordinate Blackthorn House's interest in the real estate.

As to the equipment subject to the Agreement, FVB was alerted to the termination

of the Lease and asked to remove the items to which it was entitled. No breach occurred as to that aspect of the Lien Subordination Agreement.

The record does not contain evidence of a default on the part of TSBB before the termination date of the Lease that would trigger the requirement that Blackthorn House provide notice and cure rights to FVB. Blackthorn House never declared a default by TSBB. Thus, there was no default for which Blackthorn House was obligated to provide notice and an opportunity to cure. Instead, the Lease just terminated. After the termination of the Lease, TSBB was in default of the Lease as a holdover tenant. FVB received notice of this default from Blackthorn House on April 22, 2019. Regardless, after the termination of the Lease, TSBB no longer had any notice and cure rights under the Lease and FVB was only "entitled to the same notice and cure rights as to which [TSBB] is entitled under Section 20(a) of the Lease."

The 2016 Lease Amendment, to which FVB consented, permitted either party, Blackthorn House or TSBB, to terminate the Lease upon 90 days' written notice to the other party. FVB's agreement was not required for termination. Nothing in the Amendment required Blackthorn House to extend the Lease if an option was not exercised. Blackthorn House had no duty to FVB to negotiate an extension. The terms of the Lease, as amended, ended on March 31, 2019. As FVB was aware, the parties were unable to come to any agreement and the tenancy terminated by agreement.

Upon our review, we agree with the determination of the trial court that Blackthorn House provided FVB with all the notice and cure rights to which FVB was entitled. Thus, Blackthorn House did not breach the Lien Subordination Agreement.

### b. Requested Release

We next discuss the issue of whether the trial court erred in failing to find the lender liable in damages in not releasing its leasehold Deed of Trust when the Lease terminated. Blackthorn House contends that the Deed of Trust in this case was satisfied because it was discharged as a matter of law upon termination of the Lease. In our view, the trial court did not err in finding FVB not liable in damages for failure to release the Deed of Trust.

Tennessee Code Annotated section 66-25-101 states:

When a debt secured by a mortgage, deed of trust, or by lien retained in a deed of conveyance of land or bill of sale, or other instrument, has been fully paid or satisfied, the mortgagee, transferee, or assignee of the mortgagee or the legal holder of the debt secured by deed of trust or lien, who has received payment or satisfaction of the debt, must satisfy the record by a formal deed of release.

- 9 -

Tenn. Code Ann. § 66-25-101(a). If a debt has been fully paid or satisfied, and a mortgagee does not release the lien, then section 66-25-102 comes into play:

> (a)  If the holder of any debt secured by real property situated in this state fails to enter a proper release of record after having been fully paid or satisfied within forty-five (45) days from the receipt of a written request from the party making such payment, including, but not limited to, the maker, the mortgagor, the purchaser of the property covered by such instrument or any closing agent or attorney who has collected and transmitted funds for such payment, the holder of the debt shall forfeit to the party making such request the sum of one hundred dollars ($100).
>
> (b)  If the indebtedness is not released within the forty-five-day period provided in subsection (a), the party having requested the release shall again request the release, and, if after thirty (30) days from the second request, the indebtedness has not been released, the holder shall forfeit to the party making the request a sum not to exceed one thousand dollars ($1,000).

"The Tennessee Supreme Court has held that [Tennessee Code Annotated section 66-25-102] must be strictly construed and thus that the party seeking to invoke it must demonstrate that it is among the class of persons the statute is intended to protect." *Hinson v. Midland Bank & Tr. Co.*, No. 85-187-II, 1986 WL 8279, at *6 (Tenn. Ct. App. July 30, 1986) (citing *Kitts v. Kitts*, 136 Tenn. 314, 318-19, 189 S.W. 375, 376 (1916)). The class of persons to which the statute relates is as follows:

> The language of the statute indicates that the statute is intended to protect the party that fully paid or satisfied the debt. Tenn. Code Ann. § 66-25-102; *See, e.g., Hinson v. Midland Bank & Tr. Co.*, No. 85-187-II, 1986 WL 8279, at *6-7 (Tenn. Ct. App. July 30, 1986).

A panel of this court applied this rule accordingly in *Hinson*, in which a purchaser of property, Mr. Hinson, sued a local bank to quiet title due to a recorded deed of trust that the bank refused to release. *Hinson*, 1986 WL 8279, at *3. The bank's recorded outstanding deed of trust secured debts that were owed and paid by one of the sellers of the property. *Id.* at *2-3. Even though Mr. Hinson was the current owner of the property at issue, this court found that, because Mr. Hinson "made no payments to the bank to release the disputed deed of trust," he was not entitled to seek the penalty of Tennessee Code Annotated section 66-25-102. *Id.* at *6-7. Instead, it was the seller "who repaid the loan secured by the deed of trust" "who had the right to seek the Tenn. Code Ann. § 66-25-102 remedies."

Blackthorn House is not a mortgagee of FVB or its predecessor in interest. It is not

- 10 -

in privity of contract with FVB as to the loan made to TSBB. Just like Mr. Hinson, Blackthorn House made no payments to FVB to pay or satisfy the loan secured by the disputed Deed of Trust. In fact, the debt was never "fully paid or satisfied." Tenn. Code Ann. § 66-25-102. Thus, Blackthorn House is not within the class of persons that Tennessee Code Annotated section 66-25-102 was intended to protect and is not entitled to seek the penalty laid out in the statute. The trial court committed no error on this ground.

### c. Rule 15.02 Motion

The next issue before us is whether the trial court erred by not entering a ruling on FVB's Rule 15.02 Motion to Amend its Counterclaim to Conform to the Evidence at Trial. FVB's motion sought to amend its counterclaim to include a claim for breach of the Second Lease Amendment. Although the trial court did not explicitly rule on the motion to amend, the court implicitly granted it. The court made findings of fact in the Memorandum Opinion and Order regarding the Second Lease Amendment. Additionally, in the section addressing "Breach of Contract," the trial court stated,

> In counterclaim, [FVB] asserts that [Blackthorn House] was required to provide formal notice of tenant default and provide [FVB] an opportunity to cure under the Lien Subordination Agreement and Second Lease Amendment. [FVB] claims that [Blackthorn House] did not provide [FVB] with an opportunity to cure and claims damages in excess of $350,000.

(Emphasis added).

We hold that the trial court implicitly granted FVB's Rule 15.02 Motion to Amend its Counterclaim to Conform to the Evidence at Trial. The court clearly considered this claim, stating, "[t]he Court notes that [Blackthorn House] and [FVB] were not in privity of contract except for the Lien Subordination Agreement." In making this statement, the court concluded that FVB and Blackthorn House were not in privity of contract with regard to the Second Lease Amendment and thus, FVB could not seek a claim for breach. The court further addressed the Second Lease Amendment in its amended order stating, "[FVB] primarily argues that the Court applied a clear error of law when considering the . . . Second Lease Amendment. However, the Court reiterates its concern that [FVB] failed to mitigate its damages." This statement reveals that the trial court did consider the breach of the Second Lease Amendment issue, came to its primary conclusion that there was no privity of contract, and additionally came to the alternative conclusion that FVB could not recover for a breach of the Second Lease Amendment because FVB failed to mitigate damages. The above statements by the court indicate that the court implicitly granted FVB's Motion to Amend the Counterclaim to Conform to the Evidence. Thus, no error or abuse of discretion occurred in not entering a ruling on the motion to amend.

### d. Second Lease Amendment

Another issue before us is whether the trial court erred in failing to find that Blackthorn House breached the Second Lease Amendment that acknowledged FVB's security interest by allegedly refusing to provide FVB an opportunity to cure a default and to assume the lease agreement. We find that the trial court correctly determined that Blackthorn House did not breach any obligation in the Second Lease Amendment.

"A contract is an agreement between two or more persons that creates obligations that are legally enforceable by the contracting parties." *Wallis v. Brainerd Baptist Church*, 509 S.W.3d 886, 898–99 (Tenn. 2016) (citing *West v. Shelby Cnty. Healthcare Corp.*, 459 S.W.3d 33, 46 (Tenn. 2014)). "A contract is presumed to be executed for the benefit of the contracting parties and not for the benefit of third parties." *Id.* Nevertheless, a third party may seek to recover under a contract. *Id.* To seek to recover, the third-party must first prove, from the terms of the contract or the circumstances surrounding its execution, that, at the time of contracting, the third party was an intended third-party beneficiary of the contract. *Id.* A nonparty may be deemed "an intended third-party beneficiary of a contract . . . entitled to enforce the contract's terms," if:

> (1) The parties to the contract have not otherwise agreed;
> (2) Recognition of a right to performance in the [third party] is appropriate to effectuate the intention of the parties; and
> (3) The terms of the contract or the circumstances surrounding performance indicate that either:
> (a) the performance of the promise will satisfy an obligation or discharge a duty owed by the promisee to the [third party]; or
> (b) the promisee intends to give the [third party] the benefit of the promised performance.

*Id.* (citing *Owner–Operator Indep. Drivers Ass'n v. Concord EFS, Inc.*, 59 S.W.3d 63, 68 (Tenn. 2001)).

FVB appears to argue that it was able to become the tenant without foreclosing on the Deed of Trust. FVB further seems to assert that it had the right under the Second Lease Amendment to find another tenant and require Blackthorn House to allow the tenant a reduced monthly rent. It desired "to have an appropriate opportunity to protect its leasehold security interest by securing a new tenant who could occupy the space for the remainder of the lease term that secures the debt owed to the Bank and the availability of the equipment for use at the premises would make the space more marketable to prospective tenants." In our view, however, FVB was not an intended third-party beneficiary of the Second Lease Amendment.

Blackthorn House and TSBB entered into the Second Lease Amendment to reduce

the term of TSBB's tenancy without modifying FVB's interest in the leasehold interest. The Second Lease Amendment specifically acknowledges FVB's security interest and contains a specific reservation of rights to FVB as to its security interest in the Lease plus extensions (noting "a security interest in the Lease as security for a loan that [FVB] made to TSBB and that such security interest, including all rights and obligations that [FVB] has under the Lease pursuant to the security interest, shall not be affected or modified by this Lease Amendment.").

Blackthorn House and TSBB included Section 6(c) in the agreement limiting the application of the Second Lease Amendment to TSBB, and not FVB. The very purpose of Section 6(c) was to ensure that the Second Lease Amendment did not create a right to performance in FVB. Mr. Tarumianz testified that "[a]t the end of the three-year period, [TSBB] would be in a position to either have to renegotiate the lease or pick the lease back up where it would have been at that point in time if there had been no amendment." He further clarified:

> "My understanding of that provision is that we agreed to . . . at the end of this three years, it would go back to where it was, because it said, 'The reduction in rent affected by this lease amendment shall be personal as to TSBB, and no other party. In the event that [FVB] shall exercise the rights granted to it under the deed of trust, then the bank shall be responsible for payment of rent under the terms of the lease without any reduction, the 5 percent escalation will be applied retroactively to April 1, 2016.'"

Thus, no recognition of a right to performance in FVB is appropriate to effectuate the intentions of the parties. Because FVB was not an intended third-party beneficiary of the Second Lease Amendment, FVB cannot seek to recover under it.

### e. Failure to Mitigate Damages

The next issue to resolve is whether the trial court erred in finding that FVB did not mitigate its damages and by failing to award compensatory damages plus reasonable attorney's fees for Blackthorn House's breach of contract, together with FVB's attorney's fees on appeal. The failure to mitigate damages is an affirmative defense, and the burden of proving a failure to mitigate falls on the party raising the defense. *Tennessee Bank & Tr. v. Boruff*, No. M2021-00552-COA-R3-CV, 2022 WL 781048, at *7 (Tenn. Ct. App. Mar. 15, 2022). The doctrine of mitigation of damages dictates that: "[O]ne who is injured by the wrongful or negligent act of another, whether by tort or breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage, and to the extent that damages are the result of his active and unreasonable enhancement thereof, or due to his failure to exercise such care and diligence, he cannot recover." *Cook & Nichols, Inc. v. Peat, Marwick, Mitchell & Co.*, 480 S.W.2d 542, 545 (Tenn. Ct. App. 1971). Thus, a party injured by the wrongful act of another is under a legal

- 13 -

duty to use reasonable efforts to minimize the loss and, to the extent that the injured party fails to do so, he or she cannot recover. *Boruff*, 2022 WL 781048, at *7. The injured party is not, however, required to mitigate damages where the duty would impose an undue burden or be impossible under the circumstances. *Id.*

Blackthorn House raised the affirmative defense to the breach of contract claims that FVB failed to mitigate its damages. Because Blackthorn House raised this affirmative defense, it has the burden of proving FVB failed to mitigate damages. *Id.* at *7. Blackthorn House has not met its burden, and we agree with the trial court that consideration of the issue is unnecessary.

As noted by the court:

Assuming Defendant had the same rights as the Tenant to cure[,] Defendant's rights expired at the time of the expiration of the lease o[n] March 31, 2019, with exception to Defendant's right to Collateral under the Lien Subordination Agreement. Therefore, Defendant did not prove a breach of contract because the lease expired, and if there was a breach, the initial breach occurred when the tenant breached, not when Plaintiff sought a higher rent. The Court finds that Defendant is bound by the expiration of the lease and/or the first breach when the tenant entered into default.

We note that the trial court further commented that, "Defendant produced little persuasive evidence to support its claim for monetary damages, and presented no evidence to show how Defendant mitigated its damages." There was little discussion at trial regarding the extent to which FVB could have sought alternative remedies to mitigate its damages specifically in relation to the leasehold interest. Moreover, there was limited discussion of the damages FVB suffered as a result of the alleged breach of the contracts. FVB presented evidence of the amount outstanding on the Loan, but this case is not about the Loan as a whole. Rather, it is instead about FVB's interest in the leasehold interest and the extent to which the value of that leasehold interest was decreased by Blackthorn House's alleged breach of contract.[6]

### f. Attorney's Fees

Another matter before us is whether the trial court erred in failing to award attorney's fees to the property owner for its "successful defense" of a claim involving a

---

[6] FVB's predecessor loaned money to TSBB to buy the existing "Mountain Market" business and for additional equipment acquisitions, inventory, and operating capital. FVB secured repayment of that Loan in three different ways. First, the Loan was collateralized by the leasehold interest at issue in this case. Second, the Loan was collateralized by the lien FVB took on the personal property on the Property. Third, FVB required the owners of TSBB to guarantee the debt.

contract with an attorney's fees clause. Blackthorn House argues the trial court erred when it refused to award, pursuant to the Lien Subordination Agreement, its attorney's fees incurred in defending the lawsuit brought against it by FVB. We hold that the trial court did not err on this ground.

Blackthorn House notes that the Lien Subordination Agreement provides for an award of attorney's fees and expenses to the prevailing party, and a prevailing party is entitled to enforcement of an attorney fee provision in accordance with its terms. *See Seals v. Life Inv'rs Ins. Co. of Am.*, No. M2002-01753-COA-R3-CV, 2003 WL 23093844, at *4 (Tenn. Ct. App. Dec. 30, 2003) (citing *Wilson Mgmt. Co. v. Star Distribs. Co.*, 745 S.W.2d 870, 873 (Tenn. 1988)). Blackthorn House claims that it was the prevailing party as to the claim on the Lien Subordination Agreement.

As noted in *Seals*, Tennessee follows the "American Rule" that, in the absence of a contract, statute or recognized ground of equity, attorney's fees are not recoverable from the unsuccessful party in a lawsuit. *State ex rel. Orr v. Thomas*, 585 S.W.2d 606, 607 (Tenn. 1979); *Pullman Standard, Inc. v. Abex Corp.,* 693 S.W.2d 336, 338 (Tenn. 1985). When a provision in the contract provides for the collection of attorney's fees from the unsuccessful party in the event litigation arises, the prevailing party is entitled to enforcement of the contract according to its express terms. *Wilson Mgmt. Co.*, 745 S.W.2d at 873; *Hosier v. Crye-Leike Commercial, Inc.,* No. M2000-01182-COA-R3-CV, 2001 WL 799740, *3 (Tenn. Ct. App. July 17, 2001). Therefore, "parties who have prevailed in litigation to enforce contract rights are entitled to recover their reasonable attorney's fees once they demonstrate that the contract upon which their claims are based contains a provision entitling the prevailing party to its attorney's fees." *Hosier*, No. 2001 WL 799740, at *3; *see Seals*, 2003 WL 23093844, at *4.

When the contract provides that a prevailing party is entitled to recover its attorney's fees for enforcing the contract, "the trial court has no discretion regarding whether to award attorney's fees or not." *Hosier,* 2001 WL 799740, at *3; *see also Carson Creek Vacation Resorts v. Dep't of Revenue*, 865 S.W.2d 1 (Tenn. 1993). It is the amount of the attorney's fee award that falls within the trial court's discretion. *Hosier,* 2001 WL 799740, at *3 (citing *Albright v. Mercer*, 945 S.W.2d 749, 751 (Tenn. Ct. App. 1996); *Airline Constr. Inc. v. Barr*, 807 S.W.2d 247, 270 (Tenn. Ct. App. 1990)).

A claim for attorney's fees must be specifically pleaded under Rule 9.07 of the Tennessee Rules of Civil Procedure. *Cross v. McCurry*, 859 S.W.2d 349, 353 (Tenn. Ct. App. 1993). The fundamental purpose of the pleading requirement in Rule 9.07 is notice. *Keisling v. Keisling*, 92 S.W.3d 374, 377 (Tenn. 2002); *Castelli v. Lien*, 910 S.W.2d 420, 429 (Tenn. Ct. App. 1995). "[P]rudent lawyers seeking to recover attorney's fees should include a specific request for attorney's fees in their pleadings that includes a specific reference to the contractual, statutory, or other substantive basis for an award of attorney's fees." *Hardcastle v. Harris*, 170 S.W.3d 67, 90 (Tenn. Ct. App. 2004).

Here, the trial court found that Blackthorn House did not breach the Lien Subordination Agreement, which provided that "[i]n the event of any litigation between Landlord and Lender (including appellate and adversary proceedings in bankruptcy) arising out of or in connection with this Agreement, the prevailing party will be entitled to recover its reasonable attorney's fees and expenses." Despite the contract provision, the trial court did not award Blackthorn House attorney's fees because Blackthorn House failed to specifically plead its contractual right to the award of attorney's fees. Although Blackthorn House requested attorney's fees in its Answer to Reasserted Counterclaim, it did not assert a contractual right to an award of attorney's fees until its Motion to Alter or Amend after trial and after entry of the court's Memorandum Opinion and Order. The trial court determined that under Rule 9.07 and *Marshall v. First Nat'l Bank*, 622 S.W.2d 558 (Tenn. Ct. App. 1981), Blackthorn House was required to specifically plead a request for attorney's fees under the Lien Subordination Agreement and failed to do so. FVB was never put on notice of Blackthorn House's intent to seek attorney's fees under the Lien Subordination Agreement. The trial court did not abuse its discretion by not awarding attorney's fees to Blackthorn House under the contract.

We further hold that an award of attorney's fees and costs to Blackthorn House is not appropriate for this appeal. Under Tennessee Code Annotated section 27-1-122, this court may award damages if an appellant pursues a frivolous appeal. "A frivolous appeal is one that is devoid of merit,' or one in which there is little prospect that it can ever succeed." *Indus. Dev. Bd. of City of Tullahoma v. Hancock*, 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995) (citing *Combustion Engineering, Inc. v. Kennedy*, 562 S.W.2d 202 (Tenn. 1978)). This was not a frivolous appeal. Although the trial court's holdings were upheld, its reasoning was arguably confusing and debatable at times. The issues raised on appeal addressed these matters. Because the issues presented brought up valid concerns, they were not "devoid of merit." *Hancock*, 901 S.W.2d at 385. Therefore, the appeal was not meritless, and Blackthorn House is not entitled to an award for fees and costs for this appeal.

### g. Waived Issues

Blackthorn House's brief included arguments relating to "whether the Trial Court erred in failing to find First Volunteer liable for Interference with Contract and Business Relations" and "whether the Trial Court erred in failing to find First Volunteer liable for Defamation of Title." However, neither issue was designated as an issue on page 6 of Blackthorn House's brief laying out "Statement of Issues on Appeal." It is well settled that "[w]e may consider an issue waived where it is argued in the brief but not designated as an issue." *See Forbess v. Forbess*, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011); *Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002); *see also* Tenn. R. App. P. 27(a) (requiring that an appellant present "[a] statement of the issues presented for review"). Thus, both of the above listed issues are considered waived.

## V. CONCLUSION

The judgment of the trial court is affirmed, and this cause is remanded to the trial court for collection of the costs below. The costs on appeal are assessed against the appellant, First Volunteer Bank of Tennessee.

_____
JOHN W. MCCLARTY, JUDGE